John Mark VELLINGA, Plaintiff
and Appellant.

v.

Delores Ann VELLINGA,
Defendant and Appellee.

No. 16139.

Supreme Court of South Dakota.

Considered on Briefs Jan. 9, 1989.

Decided June 21, 1989.

Gary J. Pashby and Michael S. McKnight of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, for plaintiff and appellant.

Lee R. Burd, Sioux Falls, Judy Garnos, Legal Intern, on the brief, for defendant and appellee.

McMURCHIE, Circuit Judge.

Husband appeals the trial court's denial of his request for retroactive modification of his child support obligation and claims the trial court erred in interpreting the terms of his obligation and in calculating arrearages.

### FACTS

John (husband) and Delores (wife) Vellinga were divorced in 1981. At the divorce hearing, husband and his attorney [1] offered a stipulation and agreement (stipulation) which was accepted by the trial court and incorporated by reference in the divorce decree.

Under the terms of the stipulation, wife was granted custody of the couple's one child and husband agreed to pay child support. Husband was employed as a real estate salesman at the time of the divorce and has continued to be so employed. The stipulation required him to pay 15% of his gross earnings as child support. Husband was to make the support payments on or about the fifth day of each month following receipt of his commission check.

Husband fell behind in his support payments. He made no payments in 1986. When this pattern of non-payment continued until September 1987, wife filed an order to show cause, seeking arrearages. Wife requested that arrearages be based

1. Neither party is represented by the attorney that represented him or her in the original divorce proceedings.

upon 15% of husband's gross earnings from real estate commissions.

The hearing was held on October 26, 1987. Three days prior to the hearing husband filed a petition urging the trial court to either: 1) interpret the terms of the stipulation to mean that his support obligation was based upon his total income as reported in his income tax return, or 2) retroactively modify and recalculate his support obligation based upon either his income as taken from his tax returns or upon his commission income after subtracting his business expenses. Husband urged the trial court to adopt one of these alternative theories rather than base his support obligation on his gross income from real estate commissions.

The trial court ruled that husband's support obligation was to be based upon his gross earnings from real estate commissions. The trial court found that husband's gross earnings from real estate commissions totaled $226,939.25 for the period of time from 1981 through October 23, 1987. The trial court further found, by applying the 15% formula, that husband was obligated to pay $34,040.89 for the same period of time. From this amount the trial court subtracted the amount of child support that husband had paid, $11,202.50,[2] to arrive at a finding of arrearages in the amount of $22,838.39. Judgment was entered accordingly.

## ISSUE I

### DID THE TRIAL COURT ERR IN DENYING HUSBAND'S REQUEST FOR MODIFICATION OF HIS PAST DUE SUPPORT PAYMENTS?

Husband contends that the trial court had the authority to retroactively modify his support obligation. Specifically, he claims that SDCL 25–7–7.3 only applies to payments which accrue after the effective date of the statute. He contends that the trial court erred in denying his request for retroactive modification of the payments which accrued prior to July 1, 1987.

Wife urges that the trial court properly denied husband's request for retroactive modification. She asserts that SDCL 25–7–7.3 prohibits modification of arrearages which accrued prior to the time that the trial court was petitioned for modification.

Prior to passage of SDCL 25–7–7.3, this court held that a trial court had authority to retroactively modify child support payments. *State ex rel. Larsgaard v. Larsgaard,* 298 N.W.2d 381 (S.D.1980). Retroactive modification was permitted under the discretion provided by SDCL 25–4–41 and SDCL 25–4–45. *Id.* Modification was allowable even where the original judgment was based upon a stipulation between the parties. *Connolly v. Connolly,* 270 N.W.2d 44 (S.D.1978).

In 1987, however, the South Dakota Legislature addressed the issue of retroactive modification of past due support payments with the enactment of SDCL 25–7–7.3. That statute provides:

> Any past due support payments are not subject to modification by a court or administrative entity of this state, except those accruing in any period in which there is pending a petition for modification of the support obligation, but only from the date that notice of hearing of the petition has been given to the obligee, the obligor, and any other parties having an interest in such matters.

The question of whether SDCL 25–7–7.3 is to be given retroactive application is an issue of first impression for this court. The construction of a statute is a question of law. *Nash Finch Co. v. South Dakota Dept. of Rev.,* 312 N.W.2d 470 (S.D.1981). Rules regarding the construction of statutes have, however, been set forth by the South Dakota Legislature. Statutes are not to be construed as retroactive unless such intention plainly appears. SDCL 2–14–21. Words are to be under-

---

**2.** Upon review this court notes that there appears to be an error in the addition of the support payments actually made. The amounts of paid support listed on page 4 of wife's brief and on page 18 of the settled record total $12,- 202.50 rather than $11,202.50. If the amount of support payments actually made is in error, the amount of arrearages due will be in error by the same amount.

stood in their ordinary sense. SDCL 2–14–1.

■ The express language of SDCL 25–7–7.3 divides past due support payments into two groups: 1) payments which accrue subsequent to the petitioning for modification, and 2) payments which accrued prior to the petitioning for modification. Payments which accrue while a petition for modification is pending may be modified, but only from the date that notice of hearing has been given to the obligee and any other interested parties. Payments which accrued prior to the filing of a petition to modify may not be modified.

The legislature's intent to prohibit modification in all but very limited circumstances plainly appears on the face of the statute. A narrow window is provided for modification of past due payments which accrue after notice of hearing is given to the obligee. *Any* other past due support payments are not subject to modification. The use of the term *any*, understood in its ordinary sense, clearly encompasses both past due support payments which accrued after the effective date of the statute and those which accrued prior to July 1, 1987.

In applying the rules of statutory construction to SDCL 25–7–7.3, we conclude that legislature's intention that this statute be given retroactive application plainly appears on the face of the statute. We further note that in 1987 the legislature enacted several additional statutes that address child support obligations. *See* SDCL 25–7–7.1 through SDCL 25–7–7.5. For the most part, the purpose of these statutes appears to be to clarify and generally tighten the liability of the obligor. This comprehensive effort by the legislature further persuades the court that SDCL 25–7–7.3 was intended to be given retroactive application. Each statute must be construed according to its manifest intent as derived from the statute as a whole, as well as other enactments relating to the same subject. *Meyerink v. Northwestern Public Service Co.*, 391 N.W.2d 180 (S.D.1986). For these reasons, we specifically hold that SDCL 25–7–7.3 is to be applied retroactively.

Husband did not petition the court for modification of past due support until October 23, 1987, three days before the hearing was held. The payments which he sought modification of accrued prior to the filing of his petition. SDCL 25–7–7.3 prohibits modification of payments which accrued prior to the filing of a petition for modification. The trial court properly refused to modify husband's past due support obligation. We affirm the trial court on this issue.

### ISSUE II

IN INTERPRETING THE TERMS OF HUSBAND'S SUPPORT OBLIGATION AND IN CALCULATING ARREARAGES, DID THE TRIAL COURT ERR IN REFUSING TO CONSTRUE GROSS EARNINGS TO MEAN TOTAL INCOME AS TAKEN FROM HIS INCOME TAX RETURNS?

■ The stipulation that the parties entered into at the time of the divorce, provides that:

7. a. The parties acknowledge that Plaintiff's [husband's] earnings are derived from real estate commission sales, and because of the unpredictability of his earnings, the parties agree that Plaintiff shall pay to Defendant as child support, 15% of his gross earnings which are to be paid on or about the 5th day of each month following receipt of his commission check, if any.

Husband argues that the term gross earnings was intended to mean the total income shown by his income tax returns. In the alternative, husband argues that gross earnings should be construed to mean his net income from his real estate commissions. Under this alternative theory gross earnings would be arrived at by subtracting his business expenses from his gross income from real estate commissions. In support of this alternative theory, husband argues that at the time of the divorce his business expenses were paid by the broker with whom he was associated. After the divorce, commencing sometime in 1981, he was required to pay his own expenses. Husband claims that the trial

court erred in not interpreting gross earnings according to one of his theories.

Husband's alternative theories of interpretation were presented for the trial court's consideration. The trial court was unpersuaded. The trial court noted from the bench that husband had "made his own deal" and that determining the amount he owed is "just a matter of running a calculator."

The trial court specifically found that husband proposed the stipulation and knew and understood its meaning. The court further found that the stipulation required husband to pay 15% of his total gross earnings from his real estate commissions each month as child support. Specific findings were entered regarding the amount of husband's gross earnings from real estate commissions, the amount of child support paid since the divorce, and the amount of back support due to wife. The trial court concluded that wife was entitled to these arrearages as a matter of law and entered judgment accordingly.

The trial court did not find the terms of the stipulation which imposed the support obligation to be ambiguous. Neither do we. Interpreting gross earnings to mean the gross income from husband's real estate commissions is no more than a literal reading of the express language of the agreement. The trial court did not err in interpreting the terms of the stipulation.

The trial court is affirmed on the merits of this issue as well. Only the recalculation of the amount of arrearages is remanded to the circuit court in order that the addition error, as explained in footnote 2, may be corrected.

MORGAN, SABERS and MILLER, JJ., concur.

HENDERSON, J., dissents.

McMURCHIE, Circuit Judge, for WUEST, C.J., disqualified.

HENDERSON, Justice (dissenting).

I respectfully dissent. SDCL 25–7–7.3 is unconstitutional, as it represents legislative encroachment upon the constitutional power of the judiciary.

The doctrine of separation of powers is an integral part of our state constitution. Article II provides: "The powers of the government of the state are divided into three distinct departments, the legislative, executive, and judicial; and the powers and duties of each are prescribed by this Constitution." The judicial power of the state is vested in a unified judicial system. S.D. Const., Art. V, § 1. Incidental to such a constitutional grant of judicial power is inherent power to do all things reasonably necessary to the administration of justice in the case before it. *See, Smothers v. Lewis,* 672 S.W.2d 62, 64 (Ky.1984). As SDCL 25–7–7.3 prevents retroactive modification of past due child support payments without regard to the equities of the particular factual situation presented in any individual case, I would hold that statute to be unconstitutional. Under this statute, a millionaire can claim past due child support from a financially hard-pressed parent, and the courts would be unable to weigh the equities and do justice. Circumstances change and a trial court must adjudicate on the realities of the domestic situation at hand. *See, e.g., State ex rel. Larsgaard,* 298 N.W.2d 381, 384 (S.D.1980). "Were this not so, grave injustices and inequities would arise." *Id.* Here, obviously, equity has been forgotten.

If blindly followed, the effect of SDCL 25–7–7.3 is to partly overturn a century of equity jurisprudence in this Court under which child support arrearages were modifiable. In such cases, "[t]he trial court was sitting in equity and it acted in equity." *Larsgaard,* at 384. Under SDCL 25–7–7.3, principles of equity yield to static procedural barriers. This cannot be for equity did evolve in response to the erection of such barriers.

Historically, equity is rooted in Aristotle's principle of *Epieikeia,* and the Roman system of *Aequitas.* McClintock on Equity, 1–2 (2nd Ed.1948). The development of equity in Roman law was necessitated by judicial procedure so rigidly formalized and arbitrary that the slightest error was fatal.

1 Pomeroy's Equity Jurisprudence § 3, p. 4 (5th Ed.1941). The fixed "formulas" which produced injustice were tempered by Roman magistrates' application of natural law (*lex naturae*), or morality:

> Whenever an adherence to the old *jus civile* would do a moral wrong, and produce a result inequitable (*inaequuum*), the praetor, conforming his edict or his decision to the law of nature, provided a remedy by means of an appropriate action or defense. Gradually the cases, as well as the modes in which he would thus interfere, grew more and more common and certain, and thus a body of moral principles was introduced into the Roman law, which constituted equity (*aequitas*). (citations omitted). This resulting equity was not a separate department; it penetrated the entire jurisprudence, displacing what of the ancient system was arbitrary and unjust, and bringing the whole into an accordance with the prevailing notions of morality.

1 Pomeroy, § 8, p. 12–13. In England, growth of equity proceeded in a manner in many ways strikingly analogous to that in Roman law. 1 Pomeroy, § 9, p. 13. In particular, the Court of Chancery developed to grant special remedies which common-law courts could not give. 1 *Pomeroy*, § 34, p. 39. Chancery acted upon equitable principles despite express rules of law and statutes to the contrary where such action was required by equity and good conscience. 1 *Pomeroy*, § 51, p. 66. The chancellor was encharged, as early as 1468 A.D., to determine all matters "according to equity and conscience." J.H. Baker, *An Introduction to English Legal History*, 90 (2nd Ed.1979). The same "difficulty of rigidness, arbitrariness, and nonadaptation to the needs of society" gripped the English common law as had threatened to immobilize Roman law. *Aequitas* and equity developed in response. Here, with SDCL 25–7–7.3, the State Legislature has attempted to impose similar rigidity upon the judiciary.

I would continue to apply the hallowed principles of equity. As Justice Field wrote, in 1880:

> [T]he doctrine now commonly maintained is that the general superintendence and protective jurisdiction of the Court of Chancery over the persons and property of infants is a delegation of the rights and duty of the crown; that it belonged to that court and was exercised by it from its first establishment; and that this general jurisdiction was not even suspended by the statute of Henry VIII., erecting the court of wards and liveries.

*Insurance Co. v. Bangs*, 103 U.S. (13 Otto) 435, 438, 26 L.Ed. 580, 581 (1880). Therefore, a nullification by the State Legislature of the Chancery/Equity powers of the courts of this state contravenes the historical development, significance and conscience of the equitable powers of those men or women entrusted with the application of just principles of law. Our State Legislature seeks to substitute a force of rigidity over the power of judicial reason.

The infringement inflicted upon judicial authority by SDCL 25–7–7.3 is similar, in spirit and effect, to those provisions of SDCL 25–7–7 which attempt to manacle the judiciary of this state with rigid child-support guidelines.* *See, Feltman v. Feltman*, 434 N.W.2d 590, 593–94 (S.D.1989) (Henderson, J., dissenting); *Peterson v. Peterson*, 434 N.W.2d 732, 739–41 (S.D.1989) (Henderson, J., concurring in part; concurring in result in part); and, *Donohue v. Getman*, 432 N.W.2d 281, 283–85 (S.D. 1988) (Henderson, J., specially concurring). Also akin is the now-defunct "mini-judge" system of SDCL 25–7A–22, created by the Legislature in 1986 S.D.Sess.L., Ch. 218 (HB 1378), whereby the Department of Social Services was unconstitutionally authorized to exercise judicial power. *See, Sharp v. Sharp*, 422 N.W.2d 443, 448–49 (S.D.1988) (Henderson, J., dissenting); *Bruning v. Jeffries*, 422 N.W.2d 579, 582–84 (S.D.1988) (Henderson, J., concurring in

---

* The calcifying effect of SDCL 25–7–7 has, apparently, been ameliorated to some extent by 1989 S.D.Sess.L. Ch. 220, effective July 1, 1989 (H.B. 1081), whereby deviation from the guidelines may be justified by "[a]ny financial condition of either parent which would make application of the schedule inequitable."

result). This Court may address constitutional issues *sua sponte, Bayer v. Johnson,* 349 N.W.2d 447 (S.D.1984). I would do so here. The judicial branch of government is not a branch of the legislative tree. *Larsgaard,* 298 N.W.2d at 384.

"The equity jurisdiction thus vested in the circuit courts by the Constitution [of the State of South Dakota] cannot be abrogated, impaired, or circumscribed by subsequent legislative act." *Camp Crook Independent School District No. 1 v. Shevling,* 65 S.D. 14, 24, 270 N.W. 518, 523 (1936). In *State ex rel. Vig v. Lehman,* 45 S.D. 394, 399, 187 N.W. 720, 721 (1922), this Court held: "[t]he remedy awarded in chancery courts was considered to be inseparable from equity jurisdiction itself, which jurisdiction cannot be taken away or limited by legislative enactment." Legislative encroachment upon the judiciary is universally condemned:

> "The uniform view held in this country is that the legislature does not inherently possess any judicial power or any mixed jurisdiction which is partly legislative and partly judicial. Stated as a composite of the various expressions to be found in the reported cases, the rule is that the legislature may not invade, exercise, assume, usurp, or encroach upon the powers or province of the judiciary. The doctrine of separation of the powers of the government into three distinct departments is considered sufficient to prevent the legislature from exercising any judicial function whatsoever, except such as may in terms be allowed to it by the constitution itself, and any legislative act which clearly and manifestly exercises power properly belonging to the judicial department is unconstitutional."

16 Am.Jur.2d *Constitutional Law* § 326, at 862–3 (1979).

The constitutional separation of powers doctrine cannot be done away with by legislative action. *Application of Nelson,* 83 S.D. 611, 617, 163 N.W.2d 533, 536 (1968). In *Nelson,* this Court held:

> "[T]he absolute independence of the judiciary from executive or legislative control is of transcendent import. Our form of government cannot be maintained without an independent judiciary; and, if we as a people submit to a mingling of governmental power, we then accept in fact that which we most abhor—one-man autocratic control—and the constitutional safeguards of our Nation and State would then be abrogated."

*Nelson,* 83 S.D., at 618, 163 N.W.2d, at 537 (quoting *Local 170, Transport Workers Union of America v. Gadola,* 322 Mich. 332, 34 N.W.2d 71 (1948)). An imposition of autocratic rule by the legislative arm is no less dangerous to constitutional government than one-man autocracy in the executive branch. See, also, James Madison's expression, in Federalist No. 48, at 251 (J. Madison) (J. Cooke Ed.1961), of the danger of legislative usurpations, "which by assembling all power in the same hands, must lead to the same tyranny as is threatened by executive usurpation."