Ron KING, Plaintiff and Appellee,

v.

JOHN HANCOCK MUTUAL LIFE
INSURANCE COMPANY,
Petitioner and Appellant.

No. 17932.

Supreme Court of South Dakota.

Argued Jan. 11, 1993.

Decided May 19, 1993.

Rick Johnson, Johnson, Eklund & Abourezk, Gregory, for plaintiff and appellee.

Stanley E. Whiting, Whiting Law Office, Winner, for petitioner and appellant.

HENDERSON, Justice.

## PROCEDURAL HISTORY/ISSUES

Appellee Ron King (King) commenced this action against appellant John Hancock Mutual Life Insurance Company (Hancock) in July of 1990 to collect money for medical expenses that Hancock refused to cover. King further alleged a cause of "bad faith"

for the refusal. After depositions, King moved for summary judgment on the liability claim. Hancock cross-motioned on the same and moved to dismiss the bad faith claim.

On April 20, 1992, the trial court granted King's motion for summary judgment while denying Hancock's motions, holding that the bad faith claim had material facts at issue. From a July 12, 1992 order granting petition for allowance of appeal from an intermediate order, this Court agreed to review the following issues raised by Hancock:

I. Was King entitled to extended CO-BRA coverage despite his Medicare eligibility?

II. Was Hancock entitled to summary judgment on King's bad faith claim?

We affirm on Issue I, reverse on Issue II, and remand for determination of attorneys' fees.

## FACTS

As a response to the growing number of Americans without any health insurance coverage, Congress passed the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) requiring employers to provide continuation of health coverage to employees after they leave their jobs. COBRA mandated that an employer must offer continuation coverage to most ex-employees for eighteen months; such coverage could be terminated if the ex-employee became "a covered employee under any other health plan." 29 U.S.C. § 1162; *National Companies Health Benefit Plan v. St. Joseph's Hospital,* 929 F.2d 1558 (11th Cir.1991).

In 1984, Ron King was diagnosed with Multiple Sclerosis (MS). Within four years, he was declared totally disabled and qualified for Social Security disability benefits. Despite this setback, in April of 1988, King used his civil engineering degree to obtain employment with the South Dakota Department of Water and Natural Resources (DWNR).

As a part of his orientation to the new job, King was required to complete numerous forms including a notice of participation in group health insurance (contracted through John Hancock Mutual Life Insurance Company and administered by the State of South Dakota) which expressly provided, "Your coverage will go into effect on the first day of the second month following your hire date." No exceptions for Medicare recipients were indicated in the materials. As of May 1, 1988, King was covered by the state's group health plan. One month later, on July 1, he also became eligible for Medicare benefits. Unfortunately, deteriorating health led King to resign his new position on July 29 of the same year. From July 1 through July 29, King was simultaneously covered by group health and Medicare.

Soon thereafter, King received a notice from the state informing him that he could extend his state group health plan. (His termination from employment was a *qualifying event* making him eligible for extended coverage. 42 U.S.C.S. § 300bb–3.) This notice from the state specifically stated:

We have checked your records and find that you are entitled to extend your single coverage.

King, desiring to continue coverage, completed the required forms, including a section for "employee's death, divorce or legal separation, or the employee's entitlement to Medicare," and submitted them on August 11, 1988. Upon receiving approval in September for extended coverage, King began his monthly premium payments.

Meanwhile, King was under the care of Dr. J.D. Sabow of Rapid City, South Dakota, who, during January of 1989, wanted to administer hyperbaric oxygen (HBO) for King's MS. Both Sabow and King individually contacted Hancock requesting coverage for HBO.

King finally received a letter approving coverage in July, 1989—which was after eleven (11) months of COBRA coverage, eleven (11) months of premium paying. Upon receipt of this approval, King underwent the recommended HBO treatments at a cost of approximately $3,000. Dr. Sabow's bill was then forwarded to Hancock. Despite the earlier approval, claim supervi-

sors at Hancock responded by refusing coverage alleging that King's Medicare eligibility made him ineligible for COBRA. The state benefit program manager, who is responsible for making such eligibility determinations, however, was not contacted nor did he have any input in denying King's benefits.

Following Hancock's refusal to pay, the state offered to refund King's COBRA premiums and pay half of the HBO bill. King refused the offer and initiated this action.

The trial court determined that Hancock's action denied King the opportunity to exercise his right of election to continue coverage as mandated by COBRA. Hancock further usurped the state's authority to make its own eligibility determinations.

## DECISION

■ Statutory interpretation is a question of law for the court to determine, and when the trial court resolves the question in the defendant's favor, summary judgment is appropriate. *Schoenwald v. Farmers Cooperative Association*, 474 N.W.2d 519 (S.D.1991); *Vellinga v. Vellinga*, 442 N.W.2d 472 (S.D.1989). Therefore, summary judgment will be affirmed if there exists any basis which would support the trial court's ruling. *Weatherwax v. Hiland Potato Chip Co.*, 372 N.W.2d 118 (S.D.1985). Whereas this is a question of law, our review is *de novo*. *Brown v. Egan Consol. Sch. Dist. 50–2*, 449 N.W.2d 259 (S.D.1989).

I. *King was eligible for COBRA extended coverage.*

When King left state employment, he completed the requisite forms for extended coverage wherein he indicated his Medicare eligibility. According to 42 U.S.C.A. § 300bb–2(2)(D):

The coverage must extend for at least the period beginning on the date of the qualifying event and *ending not earlier* than the earliest of the following:

The date on which the qualified beneficiary first becomes, *after the date of the election* —

(i) covered under any other group health plan (as an employee or otherwise) which does not contain any exclusion or limitation with respect to any preexisting condition of such beneficiary, or

(ii) entitled to benefits under Title XVIII of the Social Security Act [42 U.S.C.A. § 1395 et seq.].

(Emphasis added). Hancock interprets this language to mean that an employee with Medicare eligibility prior to termination of employment is not eligible for COBRA coverage after the qualifying event, i.e., termination. We disagree and hold that the statutory language plainly means what it says. *Cimarron Ins. Co. v. Croyle*, 479 N.W.2d 881, 886 (S.D.1992); *Petition of Famous Brands*, 347 N.W.2d 882, 885 (S.D.1984). King made no election. His Medicare eligibility (a benefit enacted under 42 U.S.C.A. § 1395 et seq.) occurred long before the qualifying event of termination. Thus, we hold that COBRA coverage cannot be denied here.

*Oakley v. City of Longmont*, 890 F.2d 1128 (10th Cir.1989), *cert. denied*, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990), supports this view. Oakley was insured under both his employer's group plan and his wife's insurance. After termination, he required rehabilitation for a brain injury, a condition covered by the former employer's plan, but not the wife's plan. Confronted with the gap in the coverage available under the two plans, the *Oakley* court concluded that Congress must have intended continuation coverage to remain available despite the other coverage. *Id.* at 1133; *Brock v. Primedica, Inc.*, 904 F.2d 295, 297 (5th Cir.1990).

In explaining Congress' intent, *Oakley* held:

[W]e believe the plain meaning of this subsection cannot be construed to include a spouse's preexisting group plan as a condition to terminate continuation coverage. Indeed, Mr. Oakley did not "first become" covered under his wife's policy after the qualifying event that resulted in his termination from the City's employment. Nor did Congress intend a

covered employee's termination to become a condition triggering "other" coverage under a spouse's preexisting group plan. Consequently, only when we read the language of subsection (i) to refer to other coverage occurring after the qualifying event, do we preserve its plain meaning and give effect to Congress' intent.
*Oakley* at 1132.

Ten days after *Oakley*, Congress amended subsection (i) to its present language as cited earlier in this writing. Apparently, Congress agreed with the Tenth Circuit's holding that group health plan participants should not have to suffer from gaps in coverage as a result of termination of employment. *Brock* at 297; H.R.Rep. No. 101–247, 101st Cong., 1st Sess. 1452–53, *reprinted in* 1989 U.S.Code Cong. & Admin.News 1906, 2922–23.

Although King's situation arises under subsection (ii) rather than subsection (i) of 42 U.S.C.A. § 300bb–2(2)(D), the same rationale applies. King did not "first become" covered by Medicare after leaving his job.

In *Brock*, an employee was covered by both her employer's and her spouse's group health plans. Upon leaving her job, she elected to continue with her employer's plan, and subsequently made an insurance claim. The plan denied the claim based on coverage under her spouse's plan.

Citing *Oakley*, the Fifth Circuit reasoned that continuation coverage under the previous employer's plan is proper if there is a significant gap in coverage provided to the employee under her spouse's plan as compared to her previous employer's plan. *Id.* *Brock* found no gap between the plans and, thus, denied coverage.

A gap in coverage did occur in *Martin v. Prudential Insurance Co. of America*, 776 F.Supp. 1172 (S.D.Miss.1991). After termination of employment, Martin was eligible for COBRA, but chose another group health plan by accepting a new job. Though the former employer's plan covered the gap between the two insurance policies, coverage was denied because Martin had become "covered under any other

group health plan" "after the date of the election." 42 U.S.C.A. § 300bb–2(2)(D)(i); *Martin* at 1174. By choosing another plan, Martin took positive steps to abandon his former plan and subscribe to a plan which did not provide equivalent coverage. Martin had created the gap himself.

■ These cases exemplify Congress' concern with preventing group health plan participants and their dependents from being placed in a situation where they suffer gaps in the character of coverage as a result of a "qualifying event," such as termination of employment. *Brock* at 296. Continuation coverage cannot be refused simply because the ex-employee was entitled to Medicare coverage during his employment. *See National Companies Health Benefit Plan v. St. Joseph's Hospital*, 929 F.2d 1558, 1570 (11th Cir.1991).

■ A gap in coverage is especially noticeable in King's situation because Medicare does not cover HBO treatments, yet Hancock does. This is precisely why Congress subscribes to the language "after the date of the election." People are to be given the opportunity to obtain new coverage without losing equivalent coverage in the interim. In other words, a person covered by both Medicare and group health at termination will keep the same coverage until that person, not the insurance company, elects to choose otherwise. Therefore, if a gap in coverage occurs, it will be due to the individual purposely accepting less coverage.

When King left his job with the state, he was insured by Hancock, as well as eligible for Medicare. Under 42 U.S.C.A. § 300bb–2(2)(A)(i), he had 18 months to elect new insurance. Because Hancock had previously approved coverage for HBO treatments, King had no reason to make an election immediately. King did not "first become" covered by Medicare after the qualifying event; and Congress did not intend a covered employee's termination to become a condition triggering use of pre-existing coverage, whether it be Medicare or otherwise. *Oakley* at 1132. "After the date of election" plainly means "after." *Id.; Cimar-*

*ron Ins.* at 886; *Famous Brands* at 885. Thus, Medicare eligibility prior to the qualifying event does not bar an employee from COBRA coverage nor does it relieve Hancock of its obligation to provide COBRA coverage to the insured. Denying coverage in this setting would serve to frustrate, rather than foster, Congress' clear intentions. *National Companies* at 1571.

■ Furthermore, Hancock covers HBO treatments, but Medicare does not. Where gaps in coverage occur, Congress intended continuation coverage to remain available despite the other coverage. *Oakley* at 1133; *Brock* at 297. Despite Hancock's interpretation of decisional law, the federal cases clearly side with King. Summary judgment is proper where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Hurney v. Locke*, 308 N.W.2d 764 (S.D. 1981); SDCL 15–6–56(c). Thus, we find that summary judgment was proper here, and accordingly affirm.

## II. *Bad faith claim is pre-empted.*

■ Under the auspices of *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), King's bad faith claim is pre-empted. Highlighting language from the Employee Retirement Income Security Act of 1974 (ERISA), the Supreme Court noted "If a state law 'relate[s] to ... employee benefit plan[s],' it is preempted." Congress has provided no authorization for the bad faith remedy. *Id.* 481 U.S. at 53–54, 107 S.Ct. at 1556–57. Therefore, Hancock was entitled to summary judgment and we reverse on this issue.

■ Nevertheless, *Pilot Life* permits an award of attorneys' fees at the trial court's discretion via 29 U.S.C. § 1132(g)(1). This only seems just. Otherwise, insurance carriers, such as Hancock, have nothing to lose by attempting to renege on their obligations. *National Companies* at 1575–76.

Summary judgment on liability is affirmed with the bad faith claim pre-empted. We reverse and remand to the trial court to determine if attorneys' fees should be awarded.

Affirmed in part and reversed in part.

MILLER, C.J., and AMUNDSON, J., concur.

SABERS, J., concurs in part and concurs in result in part.

ZINTER, C.J., concurs in result.

ZINTER, C.J., sitting for WUEST, J., disqualified.

SABERS, Justice (concurring in part and concurring in result in part).

I concur on Issue II, but join Judge Zinter's special writing on Issue I.

ZINTER, Circuit Judge (concurring in result).

I concur in result in Issue I. Simply stated, King's pre-termination qualification for Medicare coverage did not terminate his right to extended COBRA coverage under 42 U.S.C. § 300bb–2(2)(D)(ii). The Federal Courts of Appeal which have considered this issue have concluded that where there is a "gap" in coverage, pre-termination private medical coverage will not terminate extended COBRA coverage under 42 U.S.C. § 300bb–2(2)(D)(i). *Oakley v. City of Longmont*, 890 F.2d 1128 (10th Cir.1989); *see also Brock v. Primedica, Inc.*, 904 F.2d 295 (5th Cir.1990). Although *Oakley* and *Brock* considered private group health coverage under subsection (i), the same analysis applies to Medicare coverage under subsection (ii). Application of the *Oakley* analysis is especially compelling since *Oakley* was decided before subsection (i) was amended to specifically apply to gaps in coverage for preexisting conditions.

I concur on Issue II. The United States Supreme Court has specifically held that a "bad faith" cause of action seeking punitive damages for improper processing of a claim for benefits is preempted by 29 U.S.C. § 1144(a) [ERISA § 514(a)]. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). I write only to note that Hancock did not raise this issue before the trial court. The issue of

federal preemption is, however, jurisdictional and this Court must, sua sponte, determine whether the trial court has jurisdiction over the matter. *Hardy v. West Central School District,* 478 N.W.2d 832 (S.D.1991). Because the trial court has no subject matter jurisdiction over King's "bad faith" cause of action, it must be dismissed.