**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Ryan Russell HARRIS, Defendant and Appellant.**

**No. 17834.**

Supreme Court of South Dakota.

Argued Oct. 7, 1992.

Decided Jan. 6, 1993.

Mark Barnett, Atty. Gen., Scott Bogue, Asst. Atty. Gen., Pierre, for plaintiff and appellee.

Daniel E. Ashmore and Talbott J. Wieczorek of Gunderson, Palmer, Goodsell & Nelson, Rapid City, for defendant and appellant.

MILLER, Chief Justice.

Ryan Russell Harris (Harris) appeals to this court asserting that the trial court

erred when it transferred his proceedings from juvenile court to adult court. Harris asserts that due to an alleged conflict in the juvenile statutes, the court improperly considered the interests of the public as well as the interest of the child at the transfer hearing. Harris also asserts that the court erred in ordering the transfer because the transfer is not substantially supported by evidence in the record. We affirm.

Sometime before September 11, 1991, Harris began talking to a friend about a plan to carry a gun into his math class and take the students hostage. On his seventeenth birthday, September 10, 1991, he mentioned this same plan to another friend and gave all of the money he had received for his birthday, as well as half of his paycheck, to various of his friends. He also wrote a will and a brief note of apology to his brother for his actions.

The next day, September 11, Harris arrived a few minutes late to his math class at Stevens Senior High School, Rapid City, South Dakota. Harris pulled out a sawed-off shotgun from under the long overcoat he was wearing, made the teacher leave the room and took the class hostage. When asked whether he was joking, Harris said he was not and fired a shot at one of the walls. Although Harris generally gave a warning before shooting, he was careless with the gun, waving it around the room causing the students to duck. During the next several hours, Harris fired shots into walls, overhead projectors (one of which exploded, stinging people with shards of glass) and the classroom intercom.

At one point, one of the students was sitting with her face toward her desk, her hands shaking. Harris walked up to her, pointed his shotgun at her, yelled "Boom" and walked away. When one of the students indicated that she needed to use the bathroom, Harris told her she could go. Part of his response to her question of whether he wanted her to come back was "No, I am going to shoot you in the back on the way out." She backed out of the room. A common student response to the hostage crisis was "I was scared out of my mind." Others said they thought "he would have shot an adult a lot more readily than a student." In a phone conversation with a police negotiator, Harris threatened to "blow heads off." At some point, Harris stepped into the hall and dared the police officers to shoot him.

Several hours after the students were taken hostage, cigarettes were delivered to the classroom. While students were crowded around the desk to have Harris light the cigarettes, one of the students, Chris Ericks, grabbed the shotgun from the desk. Ericks told the students to leave and they ran out of the room. Harris, begging Ericks to shoot and kill him, advanced toward Ericks and continued to advance until Ericks finally backed out the door with the shotgun. The police then apprehended Harris.

The next day, September 12, while at the detention center, Harris read the charges against him and commented: "That's all they're charging me with? Next time I'll have to do better than that." On September 13, the Pennington County State's Attorney's Office filed a forty-seven-count petition in the juvenile division of the Seventh Judicial Circuit alleging the delinquency of Harris.[1] Harris had previously come into contact with the juvenile system six months prior to this hostage situation as a result of a tire-slashing incident in March, 1991. Also, on September 12, State filed a motion to transfer the proceedings from juvenile court to adult court. Transfer hearings were held in November. On December 20, 1991, the circuit court judge granted State's motion to transfer the proceedings from juvenile court to adult court for adult criminal proceedings.

On January 6, 1992, the Pennington County State's Attorney signed a criminal complaint and information against Harris alleging commission of the same offenses contained in the earlier juvenile petition. An amended information was filed later that day which alleged only one count of kidnapping, three counts of aggravated as-

1. The petition consisted of twenty-one counts of kidnapping, twenty-three counts of aggravated assault, one count of intentional destruction to property, one count of commission of a felony with a firearm, and one count of concealment of a weapon with intent to commit a felony.

sault and one count of intentional damage to public property in the first degree. Also on January 6, the circuit court denied Harris' "Motion to Dismiss the Complaint and Information." Harris pled guilty to the amended information counts. On January 24, 1992, the court ordered "that entry of judgment of guilt be withheld and imposition of sentence on this case be, and it is hereby suspended...." on each of the counts to which Harris had pled guilty. The order continued that Harris would be placed on probation for concurrent terms of from ten to forty years upon numerous conditions which included the payment of restitution for the property damage he caused, the counseling costs for the victims of his actions, successful completion of the in-patient treatment program at the Adolescent Care Unit of McKennan Hospital in Sioux Falls, South Dakota, and attendance and successful completion of a residential treatment program at the Griffith Center in Colorado, at the completion of which further determinations will be made as to Harris' need for ongoing care or rehabilitation.

Harris asserts on appeal that the court erred when it transferred his proceedings from juvenile court to adult court. Harris first asserts that there is a conflict in the juvenile statutes as to which standard the court is to use at the transfer hearing and that the court erred when it considered the interests of the child *and* the public during a transfer hearing held pursuant to SDCL 26-11-4, rather than conducting the transfer hearing pursuant to SDCL 26-7A-5, which does not mention the interests of the public. Harris next asserts that there is not substantial evidence in the record to support the transfer of his proceedings to adult court. Additional facts will be related where appropriate.

A.

WHETHER A COURT HOLDING A TRANSFER HEARING PURSUANT TO SDCL 26-11-4 IS TO CONSIDER THE INTERESTS OF THE PUBLIC OR ONLY THE INTERESTS OF THE CHILD.

We apply the clearly erroneous standard of review as to the trial court's factual determinations. *State v. Brings Plenty,* 459 N.W.2d 390, 399 (S.D.1990). We will not overturn the trial court unless the findings are against the weight of the evidence. *Id.* "The construction of a statute is a question of law." *Vellinga v. Vellinga,* 442 N.W.2d 472, 473 (S.D.1989). Conclusions of law are reviewed de novo. *Rusch v. Kauker,* 479 N.W.2d 496, 499 (S.D.1991).

We look to the rules of statutory construction for guidance as to a statute's interpretation.

> Each statute must be construed according to its manifest intent as derived from the statute as a whole, as well as other enactments relating to the same subject. Words used by the legislature are presumed to convey their ordinary, popular meaning, unless the context or the legislature's apparent intention justifies departure. Where conflicting statutes appear, it is the responsibility of the court to give reasonable construction to both, and to give effect, if possible, to all provisions under consideration, construing them together to make them harmonious and workable. However, terms of a statute relating to a particular subject will prevail over general terms of another statute. Finally, we must assume that the legislature, in enacting a provision, had in mind previously enacted statues (sic) relating to the same subject.

*Meyerink v. Northwestern Public Service Co.,* 391 N.W.2d 180, 183-84 (S.D.1986) (citations omitted). If this court determines that the statutes do conflict, "the more recent enactment is controlling." *In re Estate of Smith,* 401 N.W.2d 736, 740 (S.D. 1987); *Kneip v. Herseth,* 87 S.D. 642, 214 N.W.2d 93 (1974). We determine that there is no conflict in these juvenile statutes.

A forty-seven felony count petition was initially filed in the juvenile division of the Seventh Judicial Circuit alleging the

delinquency of Harris.[2] State moved to have the proceedings transferred to adult court pursuant to SDCL 26–11–4 which states in part:

> At the transfer hearing, the court shall consider only whether it would be contrary to the best interest of the child *OR* of the public to retain jurisdiction over the child. (Emphasis added.)

Harris contends that at the transfer hearing the court should have followed SDCL 26–7A–5. Contrary to Harris' assertion, by the plain language, this section does not apply to chapter 26–11:

> Proceedings under this chapter [26–7A] and chapters 26–8A, 26–8B and 26–8C shall be in the interests of the child.

The juvenile laws were rewritten by the legislature in 1991. Harris finds great significance in the fact that the prior SDCL 26–7–11, which had called for a consideration of the interests of the child and of the state, as well as parents and others directly interested, as now codified at SDCL 26–7A–5, no longer mentions the interests of the state or other parties. As we do not consider this statute in isolation, *Meyerink,* 391 N.W.2d at 184; *Border States Paving, Inc. v. South Dakota Dep't of Rev.,* 437 N.W.2d 872 (S.D.1989), we point out that juvenile proceedings have never been conducted in a vacuum, free from the interests of the state. The prior SDCL 26–8–2, which also called for the consideration of the interests of many parties including the state, now follows section 5 at SDCL 26–7A–6 and still calls for consideration of the interests of the state and others. That section reads:

> Provisions of this chapter [27–7A] and chapters 26–8A, 26–8B, and 26–8C shall be liberally construed in favor of the child, the child's parents and the state....

It cannot be imagined that the legislature, in rewriting the juvenile laws in 1991, intended that the interests of the child *only* would be considered.

Harris calls our attention to the fact that in response to the Rapid City Journal's request to the trial court to open all of Harris' juvenile hearings pursuant to SDCL 26–7A–36, the court ordered the juvenile proceedings closed. Harris asserts that the court considered only the interests of the child at this closure hearing and, to be consistent, should have considered only the interests of the child at the transfer hearing. Harris is mistaken. By its terms, SDCL 26–7A–36 provides that a court faced with a closure motion may consider reasons other than the best interest of the child.[3] Indeed, the court must have done so, as it concluded there were no compelling reasons shown which warranted opening the hearings.

Finally, we note that our rules of statutory construction lead to the conclusion that the consideration of interests at this specific type of hearing (transfer) will prevail over considerations more generally applicable to juvenile proceedings. *Meyerink,* 391 N.W.2d at 184. The court did not err when it considered the interests of the state in its conduct of the transfer hearing. *State v. Lohnes,* 324 N.W.2d 409 (S.D.), *cert. denied* 459 U.S. 1226, 103 S.Ct. 1232, 75 L.Ed.2d 466 (1982), *overruled on other grounds by State v. Waff,* 373 N.W.2d 18, 22 (S.D.1985);

B.

WHETHER THE COURT CORRECTLY CONCLUDED THAT HARRIS' PROCEEDINGS SHOULD BE TRANSFERRED.

"A transfer hearing is a 'critically important' action determining vitally important statutory rights of the juvenile[.]" *In re L.V.A.,* 248 N.W.2d 864, 867 (S.D.1977);

2. In part, SDCL 26–8C–2 states: "In this chapter [26–8C] and chapter 26–7A, the term, 'delinquent child,' means any child ten years of age or older who, regardless of where the violation occurred, has violated any federal, state or local law or regulation for which there is a penalty of a criminal nature[.]"

3. SDCL 26–7A–36 reads: "All hearings in actions under this chapter [26–7A] and chapter 26–8A, 26–8B or 26–8C are closed unless the court finds compelling reasons to require otherwise." The court's order was made prior to any hearings being held on the transfer proceeding.

*Kent v. United States*, 383 U.S. 541, 556, 86 S.Ct. 1045, 1055, 16 L.Ed.2d 84, 94 (1966). Therefore, "there must be substantial evidence in the record to support the juvenile court's finding that it would be contrary to the best interests of the child *OR* of the public to retain jurisdiction over the child." *Id.* at 870 (emphasis added); *State v. Flying Horse*, 455 N.W.2d 605, 607–08 (S.D.1990); *In re D.M.L.*, 254 N.W.2d 457, 460 (S.D.1977). It is within the discretion of the trial court whether to transfer proceedings to adult court. *Flying Horse*, 455 N.W.2d at 608. "An abuse of discretion 'refers to a discretion exercised to an end or purpose not justified by and clearly against, reason and evidence.'" *Id.* Neither our cases nor the transfer statute give controlling consideration to the interests of the child over the interests of the state, or conversely, the interests of the state over the interests of the child. Nor, by the plain language of the statute, is the trial court required to consider both of these interests at the transfer hearing. SDCL 26–11–4; *L.V.A.* 248 N.W.2d at 870.

In *L.V.A.*, we outlined numerous factors to be taken into consideration at the transfer hearing, although they were "not intended to be an exclusive list." *Id.* at 869. Many of these factors were subsequently codified at SDCL 26–11–4.[4] The parties do not seriously contest the first six statutory factors.[5] Rather, Harris concentrates a substantial portion of his argument on the seventh statutory factor:

> (7) The prospect for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile, if he is found to have committed the alleged offense, by the use of procedures, services and facilities currently available to the juvenile court.

We have explained that by listing these factors, we did not intend

> to reduce the discretion of the trial judge in transfer hearings, nor was it the intention to create a rigid or cumbersome procedure to be followed by the trial courts in all cases. It is not necessary that evidence be presented on all of these factors at each transfer hearing, or that the trial court must make express findings on each factor.

*D.M.L.*, 254 N.W.2d at 459.

■ A court is not required to consider every one of the listed factors nor is it confined to a consideration of only the listed factors to the exclusion of others. SDCL 26–11–4; *D.M.L.*, 254 N.W.2d 457; *L.V.A.*, 248 N.W.2d 864. No controlling weight is given to any factor. *Id.* The court's findings of fact upon which its order is based "shall not be set aside upon review unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." SDCL 26–11–4.

■ Harris asserts the transfer court's finding that Harris "is a serious risk to the public safety at large," is clearly erroneous. "The court may consider evidence which would show that confinement and

4. We stated in *L.V.A.* that these factors fall into "two basic areas of consideration: (1) the circumstances of the crime, and (2) the amenability of the juvenile to treatment within the juvenile system." *Id.* at 868. As amended subsequent to our decision in *L.V.A.*, SDCL 26–11–4 makes no such division. Although the trial court made such a division in its consideration of the factors, we do not find such a division necessary.

5. In pertinent part, SDCL 26–11–4 reads:

> The following factors may be considered by the court in determining whether a child should be transferred:
>
> (1) The seriousness of the alleged offense to the community and whether protection of the community requires waiver;
>
> (2) Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;
>
> (3) Whether the alleged offense was against persons or property with greater weight being given to offenses against persons;
>
> (4) The prosecutive merit of the complaint. The state shall not be required to establish probable cause to show prosecutive merit;
>
> (5) The desirability of trial and disposition of the entire offense in one proceeding when the child's associates in the alleged offense are adults[;]
>
> (6) The record and previous history of the juvenile;

security of the juvenile are necessary for the continuing protection of the public[.]" *L.V.A.*, 248 N.W.2d at 869; SDCL 26–11–4(7).

Dr. Rewey testified that Harris needs intensive inpatient psychiatric care to get past his very high suicidal tendencies. This could take one to two months or more. Harris' suicidal impulses were accompanied by anger which Harris feared he could not control. When Harris last unleashed his suicidal impulses, he took students hostage under circumstances which were ripe for serious physical injury or death to himself or others. Harris said after he was apprehended, that he had come close to shooting his teacher, although at least one student later testified that Harris told the students he was not there to shoot anyone and that none of them would get hurt. We note that after Harris was in custody, he told a detective that he regretted causing fear in the students; he felt suicidal but did not want to kill anybody. A police negotiator and Dr. Rewey assessed Harris' actions as an attempt at a police-assisted suicide.

The time spent in psychiatric treatment can be a very high-risk time with a heightened suicidal potential. Dr. Rewey testified that he was concerned that Harris would act out in the future, though he didn't see necessarily another hostage situation occurring. We note there was some testimony that Harris did not present a threat to others. But in the absence of the intensive in-patient psychotherapy recommend by Dr. Rewey, and in light of the inherent uncertainty of successful treatment, the court was not clearly erroneous in finding that Harris was a present and future risk to the public.

Harris asserts the court's "Conclusion of Law V," that "there is not a likelihood of reasonable rehabilitation of [Harris] ... by the use of the procedures, services, and facilities currently available in juvenile court," is clearly erroneous and against the weight of the evidence. Harris supports his position with several arguments.

Harris cites this court to a number of our previous decisions wherein we noted the child's exhaustion of the juvenile system's programs without rehabilitative success and concluded that a transfer to adult court was appropriate. *See Flying Horse,* 455 N.W.2d 605; *Petition of Nilles,* 412 N.W.2d 116 (S.D.1987); *Lohnes,* 324 N.W.2d 409; *State v. Culton,* 273 N.W.2d 200 (S.D.1979); *State v. Rurup,* 272 N.W.2d 821 (S.D.1978); *D.M.L.,* 254 N.W.2d 457. Harris appears to argue that it is required that the programs in the juvenile system be exhausted without rehabilitative success before a transfer court can conclude that a particular juvenile is not likely to be rehabilitated by the juvenile justice system. Therefore, as his previous associations with the juvenile system have been minimal (his single previous contact having been for a property offense arising out of a tire-slashing incident six months prior to these events) he has not exhausted the juvenile system's rehabilitation programs and could not properly be transferred to adult court. In this, Harris is in error. In the cases cited, the individuals were repeat child offenders. Nevertheless, the failure of the juveniles to rehabilitate, despite exhausting the programs in the juvenile justice system, was merely a consideration in the decision to transfer jurisdiction from juvenile court to adult court. Neither the statute nor our decisions have required the court to find that the juvenile unsuccessfully exhausted the resources of this state's juvenile justice rehabilitation programs prior to transferring proceedings to adult court. Nor do we make such a requirement now.

Harris asserts that the court is clearly erroneous in finding that Harris' "condition would be treatable in only the most ideal of the prognostic situations" and in finding that "the extent of the severity of said psychological trauma is such that the long term effects on Harris are currently unknown and cannot be assessed with any known certainty." We find there is substantial support in the record for these findings.

Based on the testimony of Dr. Rewey, the court found that Harris has significant and possibly severe mental "issues" that

need to be faced. Harris suffers from a double depression. His underlying disorder, dysthymia, also known as a depressive neurosis, has been present for some time. Superimposed on his dysthymia for the past twelve to eighteen months is another depression. Harris has had suicidal thoughts for about a year. Dr. Rewey testified that, to a reasonable degree of medical probability, Harris was treatable. Dr. Rewey further testified that he was optimistic that, "with luck," and if Harris would actually take the anti-depressive medications which are required to effectively control his depression (which could be a problem, since Harris sees little inherent good in himself), Harris' problems could be treated before he turns twenty-one, at least to where he would not be a threat to society.

Nevertheless, Harris' problems extend beyond his potential threat to society as his problems are also personal. Harris shows a strong disinclination to return to his family. Dr. Rewey was of the opinion that a return home was not a viable option for Harris and that Harris' propensity for further aggressive and violent behavior will markedly diminish if Harris is out of his family situation. Harris has a gap in his memory of family life before the age of twelve. Harris' home life, the source of much of his anger, has not been good. Harris' previously excellent attitude towards school and authority has deteriorated beyond that which is normal for someone his age. All of these problems need to be addressed in Harris' treatment. In response to a statement from the court, Dr. Rewey said Harris' depression could continue until he was thirty or forty years old. In fact, this was usual and it would require medications to effectively control his depression.

■ Harris next asserts that the court is clearly erroneous in finding that "an out-of-state medium security facility or other residential treatment center is a possibility, but that such a placement would be highly unusual and would be limited by the alternative care funding, which funding has been predominantly insufficient for the realistic consideration of such a placement." The court may consider the "procedures, services and facilities *currently* available." SDCL 26-11-4(7) (emphasis added). Neither SDCL 26-11-4 nor our cases prohibit consideration of the cost of out-of-state treatment of a juvenile. Nevertheless, we caution against giving the cost consideration more than passing notice. The record does not reveal that undue consideration was given to cost by the court. The court merely noted the current situation. Harris' family has an insurance policy which may provide at most for thirty days inpatient treatment for mental or nervous conditions. Beyond that, Harris' mother said that she would be willing to cooperate with financial assistance should that be necessary. It is not clear from the record, however, whether such a "pledge" is enforceable. We note, however, that one of the conditions of Harris' probation is that he attend and successfully complete the residential treatment program at the Griffith Center in Colorado, to be paid for by private, not taxpayer, funding.

The court also found that "there is limited psychological treatment available at the Human Services Center for the necessary treatment of Harris." There was testimony that stays at the Human Services Center range from about thirty days to close to a year. It does not appear from the record that anyone stays for four years at the Human Services Center behavioral unit. When we consider that Dr. Rewey's most optimistic outlook was that Harris' suicidal tendencies and his potential threat to society could probably be treated in four years, but that underlying problems could extend much longer, the court was not clearly erroneous.

■ Harris next asserts that the court is clearly erroneous in finding that neither the Youth Forestry Camp nor the State Training School are "capable at this time by their methodology or treatment and rehabilitation to handle Harris with the diagnosis that Dr. Rewey has provided." It was Dr. Rewey's opinion that wherever Harris was placed, the facility needed "a sufficient[ly] comprehensive ability on the

part of the staff, [and] a level of experience working with the depressed adolescent, that enables ... a higher level need of professional competency than dealing with the primarily delinquent adolescent or a primarily anti-social personality disorder."

Dr. Rewey testified that Harris could probably attend the programs at the State Training School and Youth Forestry Camp and complete them successfully. But he also said that the programs available in these facilities were not directly suited to Harris' needs. Neither of the programs are currently designed to be long term[6] and both stress interaction with parents. Dr. Rewey testified that he could not recommend that Harris have involvement with his family during treatment. In fact, any reduction in Harris' danger to himself or others was attributed to the fact that he was no longer living in his family. The Youth Forestry Camp director stated that he was not comfortable taking Harris into his program at the present time.[7] We note that the court also found that it was possible that these institutions would be able to help Harris in the future. There is substantial evidence in the record to support this finding.

In summary, there is substantial evidence in the record to support the court's findings and reasons for transfer. *L.V.A.*, 248 N.W.2d at 870; SDCL 26-11-4. "The trial court did not abuse its discretion in determining that there was substantial evidence to support transfer." *Flying Horse*, 455 N.W.2d at 608.

Affirmed.

WUEST, SABERS and AMUNDSON, JJ., concur.

HENDERSON, J., concurs in part and dissents in part.

HENDERSON, Justice (concurring in part; dissenting in part).

Essentially, I agree with the majority opinion on the merits—but cannot agree to affirm the sentence. I maintain a serious error in law exists in this case and believe I owe a duty to call it to the attention of this Court and the Bar and Bench of this state.

Harris is a 17 year-old boy. He was transferred out of the juvenile division to the adult side of the circuit court. He was placed on 40 years probation. In my opinion, this sentence is illegal. Therefore, this case should be affirmed on the merits, but the sentence must be set aside and remanded so that the trial court can impose a legal sentence.

Subjects, thoughts, and concepts that I address have not been briefed nor presented as issues unto this tribunal. Therefore, at first blush, this writing is untenable.

However, I call attention to SDCL 23A-44-15 which provides that plain errors or defects affecting substantial rights may be noticed although they were not brought to this Court's attention. *State v. Breed*, 399 N.W.2d 311 (S.D.1987); *State v. Brammer*, 304 N.W.2d 111 (S.D.1981).

Notwithstanding, we have held that the plain error rule applies in exceptional cases and then it must be applied cautiously; the rule does not encompass every error that occurs at trial, but only those which are both obvious and substantial. *People in Interest of R.R.*, 447 N.W.2d 922 (S.D. 1989). Before us, we have an exceptional case and a substantial sentencing error.

Harris was found guilty of:

- One Count Kidnapping—Class 1 felony (Maximum Life Imprisonment and $25,000 fine);
- One Count Intentional Damage to Public Property—Class 4 Felony (Maximum 10 years and $10,000);
- Three Counts Aggravated Assault—Class 3 Felony (Maximum 15 years and $15,000 fine).

As I previously expressed, Harris was placed on probation *and* for a period of 40

6. Youth Forestry Camp programs are basically short term, generally less than one year. State Training School programs are generally designed to last less than nine months and have been averaging a little over two hundred days.

7. By statute, the Youth Forestry Camp has discretion to accept or reject a juvenile. The State Training School does not have this discretion.

years. SDCL 23A–27–12 *and* SDCL 23A–27–13 forbid probation because of his kidnapping conviction. These two statutes with added emphasis, follow:

> **SDCL 23A–27–12. (Rule 32(e)) Placement on probation—Exception.** After conviction of an offense *not punishable* by death or *life imprisonment,* a defendant may be placed on probation. No person who has been previously convicted for a crime of violence as defined in § 22–1–2(9) may be placed on probation if his second or subsequent felony conviction is for a crime of violence as defined in § 22–1–2(9).

> **SDCL 23A–27–13. Order suspending imposition of sentence and placing defendant on probation—Revocation of suspension.** Upon receiving a verdict or plea of guilty for a misdemeanor or felony *not punishable* by death or *life imprisonment* by a person never before convicted of a crime which at the time of conviction thereof would constitute a felony in this state, a court having jurisdiction of the defendant, when satisfied that the ends of justice and the best interest of the public as well as the defendant will be served thereby may, without entering a judgment of guilt, and with the consent of the defendant, suspend the imposition of sentence and place the defendant on probation for such period and upon such terms and conditions as the court may deem best. A court may revoke such suspension at any time during the probationary period and impose and execute sentence without diminishment or credit for any of the probationary period.

Under South Dakota Constitution, Art. V, § 5, the circuit courts of this state are empowered to place offenders on probation but must do so in statutorily mandated circumstances and by certain statutorily mandated ways. *State v. Oban,* 372 N.W.2d 125 (S.D.1985). It simply was not statutorily accomplished in this case.

Clearly, this sentence is illegal under *State v. Tibbetts,* 333 N.W.2d 440 (S.D. 1983) and should be corrected under Chapter 23A–31, CORRECTION OF PROCEEDINGS, and particularly SDCL 23A–31–1.

In summation, this case should be affirmed on the merits but reversed because of an improper sentence under the facts of this case and the kidnapping conviction.