**STATE of South Dakota, Plaintiff and Appellant,**

v.

**Danny D. GOODROAD, Defendant and Appellee.**

No. 18467.

Supreme Court of South Dakota.

Argued April 26, 1994.

Decided Sept. 7, 1994.

Mark Barnett, Atty. Gen., Sherri Sundem Wald, Asst. Atty. Gen., Pierre, for plaintiff and appellant.

Robert Van Norman, Rapid City, for defendant and appellee.

MILLER, Chief Justice.

This is an appeal from a circuit court's dismissal of a forgery charge on the grounds of insufficiency of the indictment and prosecutorial delay. We reverse.

## STANDARD OF REVIEW

We apply the clearly erroneous standard of review to the trial court's factual determinations. *State v. Harris,* 494 N.W.2d 619, 622 (S.D.1993); *State v. Brings Plenty,* 459 N.W.2d 390, 399 (S.D.1990). We will not overturn the trial court unless its findings are against the weight of the evidence. *Id.* Findings of fact must support the conclusions of law. *In re Kindle,* 509 N.W.2d 278, 283 (S.D.1993); *In re Hughes Cnty. Action No. Juv. 90–3,* 452 N.W.2d 128 (S.D.1990).

We review a trial court's conclusions of law *de novo.* *Harris,* 494 N.W.2d at 622; *State v. Engel,* 465 N.W.2d 787, 789 (S.D.1991).

## FACTS

In a grand jury indictment dated September 5, 1990, Danny B. Goodroad (Goodroad) was charged with forgery in violation of SDCL 22–39–36. The charges stemmed from the cashing of a $200 forged Western Union money order in a Piggly Wiggly store in Belle Fourche, Butte County, South Dakota on August 2, 1990. By the time a warrant for Goodroad's arrest was issued on September 6, 1990, Goodroad had fled South Dakota.

On October 7, 1990, Goodroad was arrested in Minnesota and charged with forgery of a Western Union money transfer check in Redwood Falls, Minnesota, on August 22, 1990.[1] While incarcerated in Redwood County, Goodroad was shown, but not given, a copy of the Butte County indictment.

During the time Goodroad was in Minnesota, he was transferred in-state to Pipestone County, McLeod County, and Blue Earth County to face various forgery charges in those counties. He was also committed to the Willmar, Minnesota State Hospital at Willmar for approximately six weeks.

On May 14, 1992, at the Blue Earth County Jail, Goodroad signed a waiver of extradi-

---

1. Goodroad pled guilty in Redwood Falls to two felony forgery charges and was given concurrent sentences of nineteen and seventeen months. The court directed the sentences be served while Goodroad was "held and surrendered over to other jurisdictions in the State of Minnesota that have detainer orders out or detention orders for you in the order which may be agreed upon by those jurisdictions."

tion from Minnesota to Pennington County, South Dakota. On May 17, 1992, he was transported to South Dakota to face criminal charges.

On June 8, 1992, he pled guilty in Pennington County to passing a forged Western Union money order on July 13, 1990. He was sentenced to five years in the South Dakota State Penitentiary and delivered there on June 10, 1992. Pennington County did not notify either Meade or Butte Counties that Goodroad was being transported to the penitentiary.

On December 10, 1992, Butte County filed an arrest warrant with the penitentiary. Goodroad was informed of Butte County's hold against him and, on December 17, 1992, he served a demand invoking his speedy trial rights upon the Butte County Clerk of Courts. On December 28, 1992, he served another demand for a speedy trial on the Presiding Judge of the Eighth Circuit Court, the Butte County State's Attorney, the Warden of the South Dakota Penitentiary and the Butte County Clerk of Courts.

On January 29, 1993, Goodroad was arraigned in Butte County and pled not guilty to the forgery charge and to a Part II Information charging him with being a habitual criminal in violation of SDCL 22–7–8.

During the next five months, Goodroad personally filed a number of motions:

1) A handwritten motion for change of counsel alleging his original counsel in this matter, the Northern Hills Public Defender's Office, had a conflict of interest.

2) A handwritten petition for a writ of mandamus to this Court requesting we order the trial judge to remove the Northern Hills Public Defender's Office and appoint other counsel.

3) A letter to his second counsel demanding the attorney not submit any motions without his approval and signature and stating that: "If you 'anticipate' trouble in doing as I request, or 'anticipate' doing the opposite of what I request in this case, please withdraw as my defense counsel right away."

4) A motion demanding recusal of the judge who had ruled against his motion for change of counsel.

In addition, Goodroad's third counsel filed two motions for continuance; one on April 23, 1993, and another on June 28, 1993. Both motions were granted.

On June 30, 1993, Goodroad filed a motion to dismiss the Butte County charge on the ground that prosecutorial delay had violated his constitutional right to a speedy trial. Hearings on the motion were held on July 1, 1993, and July 20, 1993. Also on July 1, the State filed a notice of demand for alibi defense. In Goodroad's July 12 response to the alibi demand, he also claimed the indictment was insufficient as it did not include the specific time of the alleged offense.

The trial court dismissed the indictment on July 21, 1993. It held the indictment was insufficient and that Goodroad's constitutional right to a speedy trial had been violated because there was no acceptable reason for prosecutorial delay between the date of the indictment, September 5, 1990, and Butte County's filing of an arrest warrant on December 11, 1992. The trial court also denied the State's motion to reconsider.

State appeals. We reverse.

### DECISION

#### I. THE INDICTMENT WAS SUFFICIENT.

■ The trial court concluded the indictment did not adequately describe the offense with which Goodroad was charged so as to put him on notice of "that with which he is charged." We disagree.

■ For an indictment to be sufficient it must first state all the elements of the offense charged and inform the defendant of the charge against him and, second, must enable him to plead acquittal or conviction as a bar to future prosecutions for the same offense. *United States v. Bailey*, 444 U.S. 394, 414, 100 S.Ct. 624, 636–37, 62 L.Ed.2d 575, 593 (1980); *State v. Oster*, 495 N.W.2d 305, 307 (S.D.1993); *State v. Younger*, 453 N.W.2d 834, 840 (S.D.1990); *State v. Logue*, 372 N.W.2d 151, 155 (S.D.1985). We have

consistently held that an indictment is generally sufficient if it employs the language of the statute the defendant is charged with violating. *Oster*, 495 N.W.2d at 307; *Younger*, 453 N.W.2d at 840; *Logue*, 372 N.W.2d at 155.

The grand jury indictment of Goodroad stated:

COUNT I FORGERY:

That on or about the 2nd day of August, 1990, in the County of Butte, State of South Dakota, DANNY D. GOODROAD, did, with intent to defraud, falsely make, complete or alter a written instrument of any kind, or passed such an instrument, in violation of SDCL 22–39–36; and, contrary to the statute in such case made and provided against the peace and dignity of the State of South Dakota.

SDCL 22–39–36 provides:

Any person who, with intent to defraud, falsely makes, completes or alters a written instrument of any kind, or passes such an instrument is guilty of forgery. Forgery is a Class 5 felony.

It is obvious that the indictment echoed the language of the statute; therefore, it apprised Goodroad of each element of the offense and informed him he needed to defend himself against the charge. Goodroad argued, and the trial court ruled, that the indictment was insufficient because it did not describe the particular written instrument which Goodroad was alleged to have forged. We disagree. First, *the statute contains no such requirement.* Second, during discovery, a copy of the forged Western Union money order was provided to defendant on February 3, 1993, some five months before he alleged the indictment was insufficient. There can be no doubt that at that date Goodroad knew precisely what instrument he was charged with forging and needed to prepare a defense against.

Further, there is no evidence that the indictment was inadequate in some manner which would prevent Goodroad from pleading an acquittal of the conviction as a bar to future prosecutions for the same offense. *See State v. Wurtz*, 436 N.W.2d 839, 843 (S.D.1989) (holding a defendant need not derive his only protection from double jeopardy from an information, proof beyond an information may be raised); *State v. Floody*, 481 N.W.2d 242, 247 (S.D.1992). Therefore, the indictment was sufficient on its face.

■ Moreover, even if we found the indictment had a defect or imperfection, which we do not, substantial rights of the defendant must be prejudiced for the indictment to be insufficient. SDCL 23A–6–14.[2] Goodroad presented no evidence that his rights were affected in any manner by the allegedly insufficient indictment.

Thus, the trial court erred as a matter of law in granting Goodroad's motion to dismiss on the ground of insufficiency of the indictment.

## II. THE TRIAL COURT ERRED BY DISMISSING THE INDICTMENT ON THE GROUND OF A VIOLATION OF THE RIGHT TO A SPEEDY TRIAL.

The Constitution of the United States provides in part:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed ...

U.S. CONST. Amend. VI.

Similarly, under the South Dakota Constitution, the accused shall have the right "to a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed." S.D. CONST. art. VI, § 7.

■ We have adopted the four-factor balancing test set forth by the United States Supreme Court to determine whether an accused's right to a speedy trial has been violated. *Barker v. Wingo*, 407 U.S. 514, 515, 92 S.Ct. 2182, 2184, 33 L.Ed.2d 101, 117

---

**2.** SDCL 23A–6–14 provides:

No indictment or information is insufficient, nor can the trial, judgment, or other proceeding thereon be affected, by reason of a defect or imperfection in its form, which does not prejudice the substantial rights of the defendant.

(1972); *State v. Traversie,* 387 N.W.2d 2, 5 (S.D.1986).

The approach we accept is a balancing test, in which the conduct of both the prosecution and the defendant are weighed.... Though some might express them in different ways, we identify four such factors:

1) length of delay;

2) the reason for the delay,

3) the defendant's assertion of his right; and

4) prejudice to the defendant.

*Barker,* 407 U.S. at 530, 92 S.Ct. at 2191–92, 33 L.Ed.2d at 116–17.

### 1. *Length of the delay.*

■ Goodroad argues that the delay of some twenty-seven months, from his incarceration in October, 1990, until arraignment in January, 1993, was "presumptively prejudicial" under the United States Supreme Court's reasoning in *Doggett v. United States,* 505 U.S. ——, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). In *Doggett,* the Court separated the length of delay inquiry, into two steps. *Id.* at ——, 112 S.Ct. at 2690, 120 L.Ed.2d at 528. It explained: "Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay[.]" *Id.* The Court went on to clarify the meaning of the phrase "presumptive prejudice" in the context of speedy trials: "[A]s the term is used in this threshold context, 'presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; *it simply marks the point at which courts deem the delay unreasonable enough to trigger the Barker inquiry.*" *Id.* at —— n. 1, 112 S.Ct. at 2690 n. 1, 120 L.Ed.2d at 528 n. 1 (emphasis added). The Court noted a delay of approximately one year to be "presumptively prejudicial." *Id.* Therefore, a delay of twenty-seven months meets the threshold test and triggers a *Barker* inquiry.

■ If this threshold step is satisfied, the second step of the analysis requires a court to consider the extent to which delay exceeds the threshold, weighing the degree of diligence by the government in pursuing the defendant against acquiescence by the defendant to determine whether sufficient prejudice exists to warrant relief. *Id.* at ——, 112 S.Ct. at 2693–94, 120 L.Ed.2d at 531–32.

### 2. *The reason for the delay.*

To determine the reason for the delay it is helpful to remember that we are actually viewing three segments of time. The first portion is the time Goodroad spent incarcerated in Minnesota. The second segment runs from the time Goodroad was extradited from Minnesota until he was arraigned on the Butte County charges. The third portion encompasses the time from the date of the arraignment until the trial court's dismissal of the indictment.

The Interstate Agreement on Detainers Act (IADA) has been adopted by the federal government, by South Dakota, and by almost every state. 18 U.S.C. App. § 2 (1985); SDCL ch. 23–24A. Its purpose is "[to] implement the right to a speedy trial and to minimize the interference with a prisoner's treatment and rehabilitation[.]" *State v. Looze,* 273 N.W.2d 177, 178 (S.D.1979). Goodroad alleges that the first segment of time, from indictment to extradition, should be weighed against the government as it violated the IADA and was responsible for his twenty-two-month delay in asserting his speedy trial rights.

Goodroad admits that approximately a week after he was incarcerated in the Redwood County Jail he was shown a copy of the Butte County indictment. He testified as follows at the hearing on his motion to dismiss for prosecutorial delay:

Q Did anyone in the Redwood Falls, Minnesota correctional system show you anything regarding Butte County warrants [sic] in October of 1990?

A Yes sir.

Q What happened?

A I was showed [sic] a copy of a grand jury indictment in October, approximately a week after my initial arrest in Redwood Falls.

However, the trial court determined the IADA was not triggered as the State "never gave Defendant required notice of the pending indictment." In light of Goodroad's admission he was shown a copy of the Butte County Indictment, this determination was in error. The trial court also found that "Butte County, prior to December 11, 1992, did not attempt to initiate prosecution of Defendant beyond securing the Indictment." Because a detainer, based on the indictment had obviously been filed with Minnesota, that finding of fact was clearly erroneous.

The court also found that "Defendant had never been adequately informed of the Butte County Indictment such that he could make a demand for action thereon." The question of whether Goodroad was adequately informed of the indictment and his speedy trial rights rests on his own testimony at the hearing:

Q During the time that you were in Minnesota did you attempt to invoke any speedy trial rights concerning the Butte County charge?

A Yes, in Redwood Falls, Minnesota.

Q What did you do?

A I asked the corrections officer at the facility I was incarcerated at whether or not I would be getting—given speedy trial paperwork for IADA.

Q And were you given any speedy trial paperwork?

A No sir, he said I would have to wait until Minnesota was completely finished with me.

Q An IADA is what?

A Interstate Agreement on Detainers Act.

Goodroad was informed of the source and contents of the indictment against him approximately a week after he was incarcerated in Redwood Falls. As shown by his own testimony, he knew what the IADA was, knew he had a right to a speedy trial and knew he needed to file paperwork to assert that right. Yet, he did not request a speedy trial, choosing either to sit on his rights or to rely on the alleged assertion of an unnamed

correctional officer that Minnesota would be disposing of its charges first.

It is clear from the numerous articulate motions and demands in this record that Goodroad has personally drafted and had served upon officials and attorneys, that he is exceptionally familiar with the legal system and capable of drafting and serving a demand for a speedy trial.[3] In fact, within a week after he discovered Butte County intended to bring him to trial on the forgery charge, he served a demand for a speedy trial on the Clerk of the Eighth Circuit Court and another demand on the Presiding Judge of the Eighth Circuit Court, the Butte County State's Attorney, the Warden of the South Dakota Penitentiary and the Butte County Clerk of Courts. The fact that Goodroad testified he was familiar with the IADA and its provisions at the time he was first incarcerated in Minnesota seriously undermines his assertion that he relied on the alleged advice of a Minnesota correctional officer that he would have to wait until Minnesota was done with him to assert his rights. Moreover, the record reveals Goodroad had access to counsel while he was incarcerated in Redwood Falls.

The cases relied on by the trial court to find a violation of Goodroad's speedy trial rights are inapplicable. Goodroad does not claim that a deputy incorrectly completed a request form as in *United States v. Reed*, 910 F.2d 621 (9th Cir.1990); nor does he claim he was "shuttled" from jurisdiction to jurisdiction to prevent him from asserting his speedy trial rights as in *United States v. Eaddy*, 595 F.2d 341 (6th Cir.1979). Nor is this case similar to *People v. Office*, 126 Mich.App. 597, 337 N.W.2d 592 (1983), where no formal charges had been filed on which to base a detainer and the prisoner did not know he had the right to request a speedy trial.

Additionally, under the IADA, when an accused requests disposition of a charge pending in another state, such request is deemed to be a waiver of extradition. SDCL 23–24A–8. If the IADA had been activated, it would not have been necessary for Good-

---

**3.** The Eighth Circuit Court of Appeals has taken into account a defendant's awareness of the issues and competency in drafting *pro se* pleadings. *Williams v. Groose*, 979 F.2d 1335, 1337 (8th Cir.1992); *Glass v. Higgins*, 959 F.2d 88, 90 (8th Cir.1992).

road to formally waive extradition to South Dakota on May 14, 1992. The trial court erred as a matter of law in finding that the State failed to comply with the IADA.

The reason for the twenty-month delay from indictment until extradition from Minnesota is attributable either to Goodroad's flight from this jurisdiction to avoid prosecution or his failure to demand disposition of the charges against him.

The second time period is the eight months from May, 1992, when Goodroad waived extradition and was brought back to South Dakota, to his arraignment in January, 1993. Butte County's only explanation for its delay in arraigning Goodroad during this time is that it was not informed by Pennington County authorities when Goodroad was transported to the penitentiary. Those eight months weigh against the prosecution for delay or inaction.

The third segment of time, the six months from arraignment to dismissal is due to Goodroad's twice changing counsel, his demand to recuse the judge, and various other motions filed by the defense. As noted in the public defender's motion to withdraw, "Mr Goodroad's intentional actions has (sic) caused significant impediment to expediently and effectively representing him." Those six months weigh against Goodroad.

3. *The defendant's assertion of his right.*

In *Barker,* the Supreme Court emphasized:

> The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.

*Barker,* 407 U.S. at 531–32, 92 S.Ct. at 2192–93, 33 L.Ed.2d at 117–18. "The third factor places the burden on the defendant to alert the government of his grievances." *Robinson v. Whitley,* 2 F.3d 562, 569 (5th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1197, 127 L.Ed.2d 546 (1994).

In this case, Goodroad did not assert his right to a speedy trial until he was informed that Butte County had placed an administrative hold against him at the South Dakota Penitentiary in December, 1992. He asserts his waiver of extradition to South Dakota served as an assertion of that right, but presents no relevant authority to support that contention.

■ Moreover, his testimony at the hearing shows that at the time he pled guilty in Pennington County, he thought Butte County would not prosecute its charge.

> [I]t was just Mr. Wurm's [Goodroad's counsel in the Pennington County action] opinion that none of the other charges that have been outstanding since October of 1990, [the charge in Butte Co. and three forgery counts in Davison Co.] would be prosecuted under his opinion that the amount of time that I received in Pennington County in June of '92 would satisfy the other jurisdictions probably, seeings how it was a non-violent crime.

Therefore, it may have been a prudent strategy for Goodroad not to assert a demand for a speedy trial. *Barker,* 407 U.S. at 535 n. 39, 92 S.Ct. at 2194 n. 39, 33 L.Ed.2d at 120 n. 39. "Delay is not an uncommon defense tactic." *Id.* at 521, 92 S.Ct. at 2187, 33 L.Ed.2d at 111. We agree with the Tenth Circuit Court of Appeals when it stated:

> We are unimpressed by a defendant who moves for dismissal on speedy trial grounds when his other conduct indicates a contrary desire. Th[is] defendant[ ] did not want a speedy trial; [he was] only interested in delaying trial or avoiding it altogether.

*United States v. Tranakos,* 911 F.2d 1422, 1429 (10th Cir.1990) (citations omitted) aff'd, 968 F.2d 1225 (10th Cir.1992); *Barker,* 407 U.S. at 535, 92 S.Ct. at 2194, 33 L.Ed.2d at 119 ("[T]he record strongly suggests that while he hoped to take advantage of the delay in which he had acquiesced, and thereby obtain a dismissal of the charges, he definitely did not want to be tried."); "The Speedy Trial Clause primarily protects those who assert their rights, not those who acquiesce in the delay—perhaps hoping the government will change its mind or lose critical evidence." *United States v. Aguirre,* 994

F.2d 1454, 1457 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 645, 126 L.Ed.2d 603 (1993).

The third factor, assertion of the right to a speedy trial, weighs heavily against Goodroad.

### 4. *Prejudice to the defendant.*

The trial court's conclusion of law stated that Goodroad had been "significantly prejudiced by the passage of time. Among his potential alibi witnesses, one has died and others' memories have faded or failed."[4]

First, "[p]rejudice occurs only when '*defense* witnesses are unable to recall accurately events of the distant past.'" *Tranakos,* 911 F.2d at 1429 (quoting *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118). "If the witnesses support the prosecution, its case will be weakened." *Id.* (quoting *Barker,* 407 U.S. at 521, 92 S.Ct. at 2187). The faded memories of the named defense witnesses do not support Goodroad's claim he has been prejudiced by the passage of time.

Testimony by the defense investigator who interviewed the witnesses reveals that none of the defense witnesses could recall the exact date of the party Goodroad alleges he attended. However, several of the witnesses recall there was "a good deal of coming and going" at the party. Therefore, even if the witnesses could establish the party was held on August 2, 1990, and that Goodroad attended the party, the most they could testify to is that they recalled seeing him there "in varying degrees."

The same is true of the alleged alibi witness, the deceased Keith Verdi. Goodroad claims to have been with Verdi only on the morning of August 2, 1990. There is no evidence whether the forged money order was passed in the morning, in the afternoon or at night. Therefore, Verdi is not an alibi witness in the true sense of the word. "'Alibi evidence must show that the accused could not have committed the alleged crime, because at the time of its commission he was at a place other than where such offense was committed.'" *State v. Cochrun,* 434 N.W.2d 370, 373 (S.D.1989) (quoting *State v. Nelson,* 310 N.W.2d 777, 779–80 (S.D.1981)). "*An alibi 'to be successful must cover the entire time when [appellant's] presence was required for accomplishment of the crime.... [A] purported alibi that leaves it possible for the accused to be the guilty person is no alibi at all.'*" *Floody,* 481 N.W.2d at 248 (emphasis added) (quoting *Nelson,* 310 N.W.2d at 780 (citations omitted)).

Moreover, there was absolutely no showing as to what testimony Mr. Verdi would have given had he lived. *State v. Krana,* 272 N.W.2d 75, 78 (S.D.1978) ("no showing has been made that this deceased witness had testimony that was important to the case or what that testimony would have been. The mere allegation that a deceased person would have been a witness is not sufficient to show prejudice demanding a dismissal—there must be a showing of what the deceased witness knew and would have testified to"); *accord, Robinson,* 2 F.3d at 571 ("Even assuming [absent witnesses] could have and would have provided exculpatory testimony, either [defendant] or his attorney should have taken adequate steps to preserve their testimony for trial.").

Further, Goodroad pled guilty to passing a forged instrument at the Pamida Store in Sturgis, South Dakota on August 2, 1990, the same day he is alleged to have passed a forged instrument approximately twenty-six miles away in Belle Fourche.[5] The fact that Goodroad was without an alibi long enough to engage in illegal activity in Sturgis shows that his purported alibi witnesses could not cover the **entire time** when his presence was required for accomplishment of either crime. *See Floody,* 481 N.W.2d at 248. Therefore, Goodroad's purported alibi still leaves it possible for him to be the guilty person and is, in reality, no alibi at all.

---

4. Goodroad's alibi alleges he spent the morning of August 2, 1990, with one Keith Verdi in Rapid City and Sturgis and that he spent the remainder of the day at a party in Sturgis.

5. On March 15, 1993, Goodroad pled guilty to passing a forged Western Union money order in Sturgis in Meade County the same day he is alleged to have cashed the forged money order in Belle Fourche. In the plea bargain agreement, Goodroad also agreed to pay restitution to three Davison County merchants in return for an agreement they would not prosecute additional fraudulent check charges.

The trial court erred in concluding that Goodroad had suffered significant prejudice due to the passage of time.

## CONCLUSION

Goodroad's Article VI rights were not violated. While the length of time before he was tried was substantial, the majority of the delay was attributable to Goodroad himself. Although he was aware of the charge and his right to a speedy trial, he did not invoke the right for months and even then he sought further delay. Nor has he shown significant prejudice to his defense. The trial court erred in granting dismissal for violation of Goodroad's Article VI rights.

We reverse.

WUEST, SABERS and AMUNDSON, JJ., concur.

HENDERSON, J., dissents.

HENDERSON, Justice (dissenting).

I would sustain the ruling of the trial court to dismiss the Indictment as it is insufficient on its face. Simply put, the Indictment does not adequately apprise Goodroad of that of which he is accused. Further, it is simply inadequate, as framed, to enable him to plead an acquittal or conviction in bar of a future prosecution for the same (alleged) offense. The Indictment fails to specifically describe the *instrument.* Rather, it describes the instrument as *"a written instrument of any kind."* It could be anything, i.e., a bill of lading, invoice, medical or drug prescription, draft, etc. Majority opinion would rely, in determining its sufficiency, by evidence provided in a discovery process. It is the instrument itself which must be examined. Goodroad has a right to plead double jeopardy, in the future, and this wholly insufficient Indictment compromises that right. *State v. Bingen,* 326 N.W.2d 99 (S.D.1982). The precise manner in which an indictment is drawn cannot be ignored. *Accuracy is required so that a defendant may avoid proceedings which amount to double jeopardy. Sanabria v. United States,* 437 U.S. 54, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978). "A written instrument of any kind," as pleaded by the prosecution is not accurate; it is not specific; such an alle-

gation, under *United States v. Bailey,* 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980), does not fairly apprise Goodroad of the charge against him, and is therefore defective. *Russell v. United States,* 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962).

Our South Dakota Constitution (Art. VI, § 7) and both the Fifth and Fourteenth Amendments to the United States Constitution require that an accused be adequately apprised of the criminal charge. Said state constitutional provision mandates that the accused has the right to "demand the nature and cause of action against him." Statutorily, SDCL 23A–6–4 requires, inter alia, that *an indictment shall contain "the essential facts constituting the offense."* "A written instrument of any kind" is not descriptive of the "essential facts." The "cause of action" is tantamount to the "essential facts."

Moreover, our South Dakota Constitution (Art. VI, § 9) and the Fifth and Fourteenth Amendments to the United States Constitution require that the indictment be described sufficient enough to permit an accused to plead an acquittal in bar of future prosecutions for the same offense. In my opinion, the Indictment is fatally deficient on its face. I cannot believe we are bettering constitutional law by this decision. It appears the majority writing draws upon evidence, during discovery, to justify the "sufficiency" of this Indictment. This Indictment violates SDCL 23A–8–2 because it does not describe a public offense. Based upon this statute, the majority's rationale impugns this Court's holding in *State v. Schladweiler,* 436 N.W.2d 851 (S.D. 1989). In *Schladweiler,* we held that a trial court cannot inquire into the legality *or sufficiency of the evidence* upon which an indictment is based when it considers a dismissal under SDCL 23A–8–2. *State v. Hoekstra,* 286 N.W.2d 127 (S.D.1979). Thus, Circuit Judge Moses looked at the Indictment on its face and held that it was flawed, spiritually following *Schladweiler,* and not basing an opinion upon the sufficiency of the evidence.

Let us now engage in a form of logic which, for want of better terminology, we shall call the logic of "probable inference." Reference is made to SDCL 23A–6–16:

Unavailability of instrument on indictment or information for forgery. When an instrument, which is the subject of an indictment or information for forgery, has been destroyed or withheld by the act or procurement of the defendant, and the fact of the destruction or withholding is alleged in the indictment or information and established during the trial, any misdescription of the instrument is *immaterial*. (Emphasis added.)

By probable inference and hopeful logic, it appears that the specific description of the instrument (the Indictment before us) is necessary and is *material*. Perforce, Issue II dissipates into legal infinity.

As the tear ducts secrete tears when one is moved with sorrow and the adrenal gland adrenaline stimulating us with energy, the brain secretes thoughts and ideas in the competing world of the thinkers. Thereby, a dissent is born and creativity lie. Need I remind the legal profession of the intellectual and glorious days of Justices Holmes and Brandeis? Their gifts, by dissenting opinions, were monumental to the growth of the law and the preservation of the constitutional rights of the citizens of this Republic.

Inalienable rights through law were early birthed, as declared in the Holy Bible. To be accurately informed of an offense, which otherwise could eliminate freedom, has a Biblical foundation:

When Paul of Tarsus, menaced by the mob, was brought for judgment before the Roman Governor Festus in Caesarea, he said:

For if I be an offender, or have committed anything worthy of death, I refuse not to die: but if there be none of these things whereof these accuse me, no man may deliver me unto them. (*Acts* 25: xi)

The Governor agreed:

It is not the manner of the Romans to deliver any man to die, before that he which is accused have the accusers face to face, *and have license to answer for himself concerning the crime laid against him*. (*Acts* 25: xvi). (Emphasis supplied mine.)

Later, the Roman Governor, after requesting King Agrippa to hear Paul's case, declared:

For it seemeth to me unreasonable to send a prisoner, and not withal to signify the crimes laid against him. (*Acts* 25: xxvii).

From John Steinbeck, one of America's greatest writers, are representative statements of belief and commitment, originating from Chapter 13 of his 1952 novel, *East of Eden*, and his Nobel Prize Acceptance Speech in 1962.

Sometimes a kind of glory lights up the mind of a man. It happens to nearly everyone. You can feel it growing or preparing like a fuse burning toward dynamite. It is a feeling in the stomach, a delight of the nerves, of the forearms. The skin tastes the air, and every deep-drawn breath is sweet. It's beginning has the pleasure of a great stretching yawn; it flashes in the brain and the whole world glows outside your eyes. A man may have lived all of his life in the gray, and the land and trees of him dark and somber. The events, even the important ones, may have trooped by faceless and pale. And then—the glory—so that a cricket song sweetens his ears, the smell of the earth rises chanting to his nose, and dappling light under a tree blesses his eyes. Then a man pours outward, a torrent of him, and yet he is not diminished. And I guess a man's importance in the world can be measured by the quality and number of his glories. It is a lonely thing but it relates us to the world. It is the mother of all creativeness, and it sets each man separate from all other men.

I don't know how it will be in the years to come. There are monstrous changes taking place in the world, forces shaping a future whose face we do not know. Some of these forces seem evil to us, perhaps not in themselves but because their tendency is to eliminate other things we hold good. It is true that two men can lift a bigger stone than one man. A group can build automobiles quicker and better than one man, and bread from a huge factory is cheaper and more uniform. When our food and clothing and housing all are born

in the complication of mass production, mass method is bound to get into our thinking and to eliminate all other thinking. In our time mass or collective production has entered our economics, our politics, and even our religion, so that some nations have substituted the idea collective for the idea God. This in my time is a danger. There is great tension in the world, tension toward a breaking point, and men are unhappy and confused.

At such a time it seems natural and good to me to ask myself these questions. What do I believe in? What must I fight for and what must I fight against?

Our species is the only creative species, and it has only one creative instrument, the individual mind and spirit of a man. Nothing was ever created by two men. There are no good collaborations, whether in music, in art, in mathematics, in philosophy. Once the miracle of creation has taken place, the group can build and extend it, but the group never invents anything. The preciousness lies in the lonely mind of a man.

And now the forces marshaled around the concept of the group have declared a war of extermination on that preciousness, the mind of man. By disparagement, by starvation, by repressions, forced direction, and the stunning hammerblows of conditioning, the free, roving mind is being pursued, roped, blunted, drugged. It is a sad suicidal course our species seems to have taken.

In this I believe: that the free, exploring mind of the individual human is the most valuable thing in the world. And this I would fight for: the freedom of the mind to take any direction it wishes, undirected. And this I must fight against: any idea, religion, or government which limits or destroys the individual. This is what I am and what I am about. I can understand why a system built on a pattern must try to destroy the free mind, for that is one thing which can, by inspection, destroy such a system. Surely I can understand this, and I hate it and I will fight against it to preserve the one thing that separates us from the uncreative beasts. If the glory can be killed, we are lost.

*STEINBECK* 687–89 (The Viking Press 1943).

Our profession faces a common enemy: Volume, time strictures. Are we seeking that "glory" to which Brother Steinbeck alludes? Computers, machine research. Volume and machines are upon us with full force, driving us in a forced direction. As in Steinbeck's time, caught in a litigation explosion, we face the danger of a diminishment of creativity. Computers and machines, can they replace the "preciousness" which lie in the mind of man? Books, those golden keys which open the doors of knowledge, we are told by the forces of change, will fade away.

Like Steinbeck, I oppose the destruction of the free mind. Today, this mind seeks the protection of constitutional rights. If the decisions in our appellate courts are relegated to pushing a button, we shall have appellate automatons. And I would like to believe that the men and women in this profession will never forget the quality and number of their glories by the creativeness of their minds.