1998 SD 76

**The PEOPLE of the State of South Dakota, In the Interest of Y.C., Minor Child, and concerning L.S. and V.C.**

No. 20303.

Supreme Court of South Dakota.

Argued June 3, 1998.

Decided July 8, 1998.

Scott A. Abdallah, Lincoln County State's Attorney, Canton, for appellant State of South Dakota.

Deborah A. Birgen of May, Johnson, Doyle & Becker Sioux Falls, for appellee Y.C.

GILBERTSON, Justice.

[¶ 1.] The State of South Dakota appeals the circuit court's denial of a motion to transfer sixteen-year-old Y.C. to adult court in connection with charges stemming from a July 21, 1997 armed robbery of a bank. We reverse.

## FACTS AND PROCEDURE

[¶ 2.] On July 28, 1997, a juvenile petition was filed in Lincoln County, South Dakota charging Y.C., then age fifteen, with first

degree robbery and commission of a felony while armed with a firearm. Y.C.'s mother had found a bag of cash in his room and immediately summoned the police. Y.C. is alleged to have used a loaded .357 magnum pistol to obtain cash from a bank teller at the First American Bank in Worthing, South Dakota.

[¶ 3.] The State subsequently moved to transfer the case to adult court. The circuit court held hearings on the motion on August 29, 1997, and September 15, 1997. Dr. Vail Williams (Dr. Williams) conducted a court-approved evaluation of Y.C. and testified on September 15, 1997.

[¶ 4.] At the close of the hearing, the court announced it would take the transfer motion under advisement and issued an "Order for Commitment to the Human Services Center" for "examination and treatment in the appropriate program until the child successfully completes the program." We granted the State's request for an intermediate appeal and on November 3, 1997, we reversed and remanded the circuit court's order after holding it erred in committing Y.C. to a treatment program before deciding the pending transfer motion. *See People ex rel. Y.C.,* 1997 SD 126, 570 N.W.2d 36.

[¶ 5.] On remand on November 19, 1997, the circuit court denied the State's transfer motion. The circuit court apparently relied exclusively upon the testimony of Dr. Williams in concluding that Y.C. could be rehabilitated in the juvenile system. The circuit court noted it would have preferred to send Y.C. to the Human Services Center for a rehabilitation evaluation but believed this Court's previous decision precluded such a course of action.[1] The State again appeals.

[¶ 6.] **Whether the circuit court abused its discretion in denying the State's motion to transfer Y.C. to adult court.**

### STANDARD OF REVIEW

[¶ 7.] When the state files a motion for transfer, it should be denied where the juvenile court finds that it would be contrary to the best interests of the child *and* the

---

1. Our previous decision only prohibited the circuit court from ordering treatment, not an evaluation. *See Ex rel. Y.C.,* 1997 SD 126 at ¶ 5, 570 N.W.2d at 37–38 (citing SDCL 26–7A–41). The trial court was incorrect.

public to retain jurisdiction over the child. The motion should be granted where the juvenile court finds that it is "contrary to the best interests of the child OR the public to retain jurisdiction over the child." *State v. Jensen,* 1998 SD 52, ¶ 20, 579 N.W.2d 613 (citing *State v. Harris,* 494 N.W.2d 619, 624 (S.D.1993) (citations omitted) (emphasis in original)). This finding must be supported by substantial evidence in the record. *Id.* The State claims the circuit court abused its discretion by not transferring Y.C.'s case to adult court. "An abuse of discretion refers to a discretion exercised to an end or purpose not justified by and clearly against, reason and evidence." *State v. Jones,* 521 N.W.2d 662, 673 (S.D.1994) (citation omitted) (internal quotations omitted).

## ANALYSIS AND DECISION

[¶ 8.] "The purpose of juvenile court proceedings is not to punish but rather to rehabilitate and correct a juvenile's behavior so as to avoid future confrontations with the law." *Jones,* 521 N.W.2d at 667. It is also to adequately protect the public. SDCL 26–11–4 concerns criminal proceedings against a juvenile charged with a felony and lists seven factors to guide courts in transfer cases by providing in part:

At the transfer hearing, the court shall consider only whether it is contrary to the best interest of the child and of the public to retain jurisdiction over the child.

The following factors may be considered by the court in determining whether a child should be transferred:

(1) The seriousness of the alleged felony offense to the community and whether protection of the community requires waiver;

(2) Whether the alleged felony offense was committed in an aggressive, violent, premeditated, or willful manner;

(3) Whether the alleged felony offense was against persons or property with greater weight being given to offenses against persons;

(4) The prospective merit of the complaint. The state is not required to establish probable cause to show prospective merit;

(5) The desirability of trial and disposition of the entire felony offense in one proceeding if the child's associates in the alleged felony offense are adults;

(6) The record and previous history of the juvenile;

(7) The prospect for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile, if the juvenile is found to have committed the alleged felony offense, by the use of procedures, services, and facilities currently available to the juvenile court.

·          ·          ·          ·

[¶ 9.] We reiterated in *Harris,* that the seven factors listed above were not intended

to reduce the discretion of the trial judge in transfer hearings, nor was it the intention to create a rigid or cumbersome procedure to be followed by the trial courts in all cases. It is not necessary that evidence be presented on all of these factors at each transfer hearing, or that the trial court must make express findings on each factor.

494 N.W.2d at 624 (citation omitted).

[¶ 10.] Y.C. emigrated to the United States from the Ukraine at the age of seven. Shortly thereafter his parents were divorced. Y.C. enjoyed a close relationship with his mother, father, and siblings but admitted to having some difficulties with his step-father. Y.C.'s extensive and troubled history began just three years prior to the bank robbery, as Y.C. admitted four thefts and two assaults. These offenses as well as their dispositions are explained below in an examination of the various factors.

[¶ 11.] The State argues that the circuit court abused its discretion in not transferring the case to adult court. We examine the record to determine if substantial evidence exists to support the trial court's findings.

[¶ 12.] *1. Seriousness of the alleged crime and protection of the community*

[¶ 13.] This Court has stated that "[although] the seriousness of the offense alone does not warrant transfer, when considered with the other criteria, it may become the

deciding factor in making a transfer." *State v. Culton,* 273 N.W.2d 200, 202 (S.D.1979) (quoting *In re L.V.A.,* 248 N.W.2d 864, 869 ( S.D.1976)). Y.C. has been charged with two serious crimes. Both first degree robbery and commission of a felony while armed with a firearm are class two felonies. *See* SDCL 22–30–1, 22–30–6, 22–30–7, 22–14–12. The commission of a felony while armed with a firearm has been considered such a serious offense that a conviction for a first offense carries a mandatory minimum sentence of five years in the state penitentiary with this sentence to run consecutive to any other sentence imposed for a violation of the principal felony. SDCL 22–14–12. If Y.C. were tried and convicted as an adult he could be sentenced up to 50 years and a fine of fifty thousand dollars for the two offenses. *See* 22–6–1; 22–14–12.

[¶ 14.] *2. Whether the Alleged Offense was Committed in an Aggressive, Violent, Premeditated, or Willful Manner*

[¶ 15.] Y.C. was interviewed at the Sioux Falls Police Department five days after the robbery. Prior to the start of this videotaped interview, Y.C. smiled and laughed when he overheard officers talking about the Federal Bureau of Investigation and the South Dakota Division of Criminal Investigation becoming involved in his case. Y.C. then admitted planning the robbery and taking several preparatory steps including stealing his step-father's unloaded .357 magnum revolver from his lock box and his mother's vehicle to commit the bank robbery. Additionally, he purchased clothing to be worn during the crime and loaded the revolver before leaving for Worthing. Y.C. admitted choosing the bank in Worthing because Worthing is a small town that "doesn't have crap" and they only have one police officer so the chances of getting caught would be reduced.[2] When the interviewer asked Y.C. if nervousness was the reason he could not remember exactly what he had said to the teller during the robbery, Y.C. replied, *"I knew what I was doing perfectly* but I don't remember what I said. I was just yelling

stuff." (emphasis added). During the robbery, Y.C. repeatedly pointed the pistol at the bank teller and threatened to kill her if she did not comply with his demands. Y.C. complained that the teller was acting scared and "telling lies about her grandmother being sick." During the interview, Y.C. indicated he was angry with the teller because he now believed "she didn't give [him] all the money."

[¶ 16.] After the robbery Y.C. changed into a fresh set of clothes, left the bank, and "zig zagged" on gravel roads back to Sioux Falls. Y.C. admitted throwing the clothes he had worn during the robbery and the ammunition that had been in the revolver into a corn field somewhere between Worthing and Sioux Falls. Y.C. displayed no remorse for his crime, the victim, or his family. To the contrary, his attitude throughout the videotaped interview is marked with a chilling indifference devoid of the slightest indication of remorse and an open contempt for any type of authority. It is obvious Y.C. was aware of the possible consequences of his actions as he asked whether he would be charged as an adult or a juvenile. These acts are consistent with the findings in *Jensen* of "premeditation, unfeeling coldness and willingness to act violently in carrying out the robbery[.]" *Jensen,* 1998 SD 52 at ¶ 28, 579 N.W.2d at 618.

[¶ 17.] *3. Whether Alleged Offense Was Against Persons or Property With Greater Weight Given to Offenses Against Persons*

[¶ 18.] Y.C. is charged with crimes against both persons and property. During the course of the robbery, Y.C. is accused of robbing the bank teller by pointing the pistol at her head and threatening to kill her. The teller testified that the robber stated, "Give me the money, bitch" and told her he would shoot her if she was stupid or did not give him all of the money. The victim sought counseling to alleviate the intense trauma she has suffered. Rather than demonstrating

---

**2.** The offense was committed in an aggressive, violent, premeditated and willful manner and was similar to the facts that resulted in a transfer

to adult court in Jensen. 1998 SD 52 at ¶¶ 28–29, 579 N.W.2d at 618.

remorse after his arrest, Y.C. expressed anger at the bank teller as well as his intentions to injure her if he is ever released from incarceration.

[¶ 19.] Y.C. is accused of stealing approximately $20,000 from the bank. The police recovered $14,750 after Y.C.'s mother found the bag of cash in his room. While Y.C. admitted spending some of the money on food and a pair of athletic shoes, he has shown no intention of returning the missing $4,750.

[¶ 20.] *4. Prospective Merit*

[¶ 21.] Y.C. has admitted his participation in the bank robbery and the circuit court found "there is strong evidence that he committed" the crimes. Y.C. does not dispute this finding.

[¶ 22.] *5. Desirability of Trial and Disposition of Offenses in One Proceeding*

[¶ 23.] This factor is not applicable to this case.

[¶ 24.] *6. Record and Previous History of Y.C.*

[¶ 25.] Y.C.'s troubled history began when he was just twelve years old and is marked with crimes consistently escalating in severity and violence. Y.C. was convicted of various thefts in July, 1994, December, 1995, and April, 1996. In May, 1996, Y.C. was still on probation when he was convicted of aggravated assault when he brandished a switchblade knife on a schoolmate. Y.C. reportedly told his classmate that he was a "dead man" and that he should "watch his back" because Y.C. was going to kill him. Less than three months later, in July, 1996, Y.C. was convicted of assault and theft arising from an altercation with a store manager who attempted to apprehend Y.C. for stealing from the store. All of the crimes after the December, 1995, theft conviction were committed while Y.C. was on probation.

[¶ 26.] As a result of these crimes, Y.C. has been confined to the Minnehaha County Juvenile Detention Center (JDC) on at least three occasions and has been ordered to the Springfield Juvenile Detention Facility, Custer Youth Corrections Center (Custer Boot Camp), and the Youth Forestry Camp. Y.C. has failed to complete community service obligations and attend court ordered counseling on occasion over the past four years. More importantly, Y.C. has failed to abide by his agreements with juvenile courts to abstain from criminal activity.

[¶ 27.] *7. Prospects for Adequate Protection of the Public and Likelihood of Reasonable Rehabilitation Utilizing Procedures, Services and*

*Facilities Currently Available to Juvenile Court*

[¶ 28.] The trial court apparently based its decision not to transfer Y.C. on it's finding that "Y.C. has not reached the point where he cannot be dealt with as a juvenile in the juvenile justice system." Additionally, it found that "[t]reatment programs available in the adult criminal system are not appropriate for a 15 year old and specifically are not appropriate for Y.C." The trial court found that if Y.C. is not rehabilitated he would pose "a threat to society" but if he is rehabilitated he would not. This begs the question. The trial court found nothing but the obvious as a fundamental goal of rehabilitation is to lessen the threat to society. If every criminal were successfully rehabilitated, of course, they would be no threat to society.

[¶ 29.] The State claims the above findings are clearly erroneous and submits that the "likelihood of reasonable rehabilitation is remote." We must determine whether there exists "substantial evidence in the record to support the juvenile court's finding." *Harris*, 494 N.W.2d at 624. Y.C.'s history in the juvenile rehabilitation system demonstrates that the services available there have been a dismal failure.

[¶ 30.] The trial court heard the testimony of several witnesses who have been extensively involved with Y.C. through the juvenile justice system as well as Dr. Williams who spent two hours interviewing Y.C.

[¶ 31.] Ben Ahrendt, a court services officer who worked with Y.C. for nearly a year and a half, testified he believes there is noth-

ing the juvenile justice system can do at this point to rehabilitate Y.C. Douglas Reade is a Department of Corrections (DOC) agent who was responsible for overseeing Y.C.'s placement and testified he was not personally aware of a more serious offender in the statewide juvenile justice system.

[¶ 32.] The record also contains a written order from the circuit judge who committed Y.C. to the DOC in August, 1996, who went so far as to state that "[Y.C.] is a dangerous individual and *will kill somebody*" and that he should be held by the DOC as long as possible. (Emphasis added).

[¶ 33.] Lisa Barens performs individual counseling as a caseworker at JDC and testified that during the course of Y.C.'s three stays, he committed several infractions. Most were minor but others included assaults, involvement with an escape attempt, disobedience, and disrespect. She characterized Y.C.'s attitude as cavalier with a "reckless" disregard for the rules. Barens noted that neither she nor the staff had ever observed Y.C. show any remorse.

[¶ 34.] The trial court also heard the testimony of Dr. Williams who, after a two hour interview, concluded that Y.C. should not be transferred to adult court. Dr. Williams admitted that he only considered what was in Y.C.'s best interests in making this recommendation. However, he was unable to give the trial court any assurances of a likelihood of rehabilitation:

> I think that *if we have a chance* of making [Y.C.] a productive citizen and one that can turn his life around, our chances are going to be in the next three to four years. And I'm fearful that if he gets [sent to the penitentiary] he would only wind up getting exposed to some elements that would probably be even more undesirable.

(Emphasis added). As stated by the States Attorney at oral argument, this is not a statement by Dr. Williams that Y.C. is "workable."

[¶ 35.] Dr. Williams went so far as to characterize Y.C. as a "nice young man." [3] Dr.

Williams, however, conceded that Y.C. shows no desire to change his criminal behavior and counseling generally has no effect on people who do not have the desire to change. Y.C. offered candid insight into the futility of his own rehabilitation during the video-taped interview when he was asked whether he could control his stealing. He replied, "yeah … I just don't care." When asked if he understood his Miranda rights during his arrest for the bank robbery Y.C. replied, "Fuck you. Fuck you. I know what I'm doing."

[¶ 36.] Dr. Williams also prepared a written psychological evaluation on Y.C. which upon review, does little to support his ultimate conclusion. He observed that Y.C. felt "excited and good about robbing the bank." He noted that Y.C. has received counseling at several different juvenile facilities and also at the Summit Counseling Center while on probation, but only went a few times before he started skipping his sessions. Dr. Williams made several other observations including: "Y.C. does know right from wrong but frequently makes bad choices for himself"; "his behavior can be unpredictable" and impulsive; Y.C "exhibits a rather rash, impulsive willingness to court danger and risk harm"; and he "may be easily provoked [and] express sudden and unanticipated anger."

[¶ 37.] Even *after* hearing the testimony of Dr. Williams, the trial court indicated his feelings about Y.C.'s rehabilitative prospects:

> I have serious doubts about [Y.C.'s] past. He certainly hasn't shown any attempts to rehabilitate himself, and whether he's able to or not, is certainly questionable. *He's not been amenable to any rehabilitation.* He's taken upon himself the particular attitude that he can do what he pleases, say what he wants, and then the system won't necessarily deal with them, which is not necessarily true towards rehabilitation.

(Emphasis added).

[¶ 38.] Notwithstanding the trial court's obvious reservations about rehabilitation, the trial court was apparently intrigued by a

---

**3.** Dr. Williams admitted that he would not think Y.C. was a "nice young man" if he were on the receiving end of the .357 Magnum.

scenario presented by Dr. Williams where Y.C. would remain under DOC control and be placed at the Human Services Center in Yankton, South Dakota. Y.C. would then have to stipulate that any violation would result in an automatic transfer to adult court.

[¶ 39.] While we place great emphasis on the best interests of the child, we have explained "that juvenile proceedings have never been conducted in a vacuum, free from the interests of the state." *Harris*, 494 N.W.2d at 623. Certainly, the State has an interest in protecting its citizens from crime, regardless of the perpetrator's age.[4] The State has a great interest in providing adequate protection for the community as a whole. Additionally, Y.C. has made the State's interests clear in protecting a specific individual, the victim. Shortly after his arrest Y.C. callously indicated his desire to seek retaliation against his victim, the bank teller:

> That fucking bitch held out on me. When I get out of jail, I'm going to go back and fuck her up. There was more money in that bank and she should have given it to me.

The record further indicates that the facilities available in the juvenile system would not provide sufficient security for the continuing protection of the public. Y.C. could not be legally held in the juvenile system beyond the age of 21. SDCL 26–11A–5; 26–11A–20. In actuality and practice, DOC does not hold juveniles beyond age 18 which Y.C. will reach in less than two years.

[¶ 40.] The State contends there have been countless unsuccessful efforts to rehabilitate Y.C. through probation and out-of-home placement programs. Efforts to assist Y.C. through probation, community services, curfews, and counseling have failed. Y.C. concedes that he has been offered rehabilitative services at several juvenile facilities in South Dakota. Yet Y.C. appears to argue that a transfer to adult court would be impermissible because there is still at least one juvenile system he has not exhausted, namely the State Training School in Plankinton. In *Harris*, we rejected a similar claim and re-

fused to mandate that a troubled youth facing transfer must be afforded every possible chance at rehabilitation. "Neither the statute nor our decisions have required the court to find that the juvenile unsuccessfully exhausted the resources of this state's juvenile justice rehabilitation programs prior to transferring proceedings to adult court." *Harris*, 494 N.W.2d at 625.

[¶ 41.] Consideration of the record as a whole leaves this Court with a firm and definite conviction that a mistake has been made. The trial court's finding that Y.C. could be rehabilitated is not supported by substantial evidence. The only evidence to support the decision of the trial court is the brief testimony of the mother and Dr. Williams. The mother's brief testimony offers no logical basis to conclude rehabilitation is possible but rather a forlorn hope based on a mother's love for her child. The trial court accepted Dr. Williams' truism that *if* Y.C. were rehabilitated he would not be a threat to society without any realistic evidence indicating the prospects for such an idealistic outcome. Dr. Williams did not state that he believes Y.C. can be rehabilitated in the juvenile system. He was only able to state Y.C. could "possibly benefit from such a psychiatric orientation as a juvenile[.]" While a guarantee is obviously not possible, Dr. Williams merely indicated his fears of putting a "nice" fifteen-year-old "young man" into the adult system.

[¶ 42.] The State provided significant evidence to the contrary through numerous witnesses from the juvenile justice community who had extensive contacts with Y.C., as opposed to the two hour interview attempting to support Dr. Williams' ultimate conclusion. Telling are the observations of the representative of DOC that rehabilitation of Y.C. within its juvenile program is very unlikely given Y.C.'s record. Past conduct is obviously a possible indicator of future conduct. The only times Y.C. has properly conducted himself for any length of time is when he has been in a controlled institutional setting. Most significantly, neither a juvenile

---

4. *In Jensen* we noted that the average length of stay for a juvenile at Plankinton is eight to eleven months. 1998 SD 52 at ¶ 48, 579 N.W.2d at 620.

nor adult, can be rehabilitated when they show no remorse nor evidence a desire to change their improper ways. Even Dr. Williams had to concede this point. Y.C by his own admissions, shows no respect for society's rules or his victims. This combined with his lack of remorse casts grave doubts concerning his prospects for rehabilitation which strike at the foundation of the circuit court's decision. Y.C. has all but promised to continue on with his criminal rampage if given the opportunity.

[¶ 43.] Society must be protected from violent crime and the agony of its effects. It is of little or no comfort to a victim of violent crime and the victim's family that the victim's life was damaged or destroyed by a youth rather than an adult. Protection of society must be sought whether accomplished through rehabilitation or incarceration. Obviously rehabilitation is the preferred route in dealing with juveniles, but it cannot be accomplished in all cases. Here, there is no substantial evidence to conclude rehabilitation can be achieved within the juvenile system of this State.

[¶ 44.] Therefore, despite the deferential standard of review, we hold the trial court has abused its discretion and reverse. We do so as there is no substantial evidence in the record to support the trial court's findings of fact.

[¶ 45.] MILLER, C.J., and SABERS and KONENKAMP, JJ., concur.

[¶ 46.] AMUNDSON, J., dissents.

AMUNDSON, Justice (dissenting).

[¶ 47.] I dissent.

[¶ 48.] Was the trial court's decision not justified based on this record? I would hold that it was and there was no abuse of discretion. *In re A.D.R.*, 499 N.W.2d 906, 910 (S.D.1993).

[¶ 49.] There is no question that Y.C.'s conduct before and after his arrest was less than exemplary. On the other hand, we have a young man who has successfully completed two highly structured programs while under the jurisdiction of the Department of Corrections (DOC). In fact, after completing the Boot Camp program, the discharge report states:

> Mr. [C] has been a cooperative and respectful group member. He has demonstrated supportiveness toward group members as well as the ability to confront group members as needed. He has displayed a high level of integrity placing him in a category of respect among his group peers.
>
> I have concerns upon his returning to his home environment. Mr. [C] reported in his latter phase of boot camp that his cousins have recently gotten in trouble with the law and may get deported back to Ukraine, Russia. If that occurs, Mr. [C] expressed a strong desire to return to his father in Russia so he can be with his cousins. It is my recommendation that Mr. [C] return to his mother and siblings in Sioux Falls. That any contact with the cousins should be monitored and supervised until Mr. [C] has proved himself capable of remaining crime free during his probation period. As long as Mr. [C] chooses to utilize the skills and tools he has developed at the Boot Camp, particularly in self-discipline, self-control, and self-esteem, he should be successful in making it on the outside upon returning to his home environment.

*SENIOR DRILL INSTRUCTOR NARRATIVE:* This cadet is very intelligent as well as logical. He is calm and considerate, and very respectful. He was awarded for his scholastic achievement here at the Boot Camp. He is highly motivated and maintains his bearing at all times. He had three (3) positive counselings and one(1) negative. He should do extremely well at home. Currently he is anxious about either remaining with his mother in the US, or returning to his father who lives in the Ukraine (Russia).

[¶ 50.] What happened after he graduated? He was returned to the same environment where he had first gotten into trouble and was obviously not monitored and supervised as recommended. This is not the first time we have seen this in the juvenile area. In other words, the system often gets them

through the program and then loses track of them until they violate the law anew.

[¶ 51.] Is there a program in the juvenile system where this young man, who the psychologist testified to as being a victim of cultural shock, who was subject to peers calling him communist, commie or telling him to go back to Russia, and who is a child affected by the dissolution of his parents' marriage, can be salvaged. The State depicts this individual as a high-risk offender and properly so. On the other hand, the State's witness stated that such individuals are placed in the Plankinton Training School (prison) and that this juvenile had not been placed at this facility, although it was an option.

[¶ 52.] At the hearing, Y.C. was asked by the court if he desired to say anything and stated:

THE JUVENILE: Sorry to everybody I know I can change. I'll change.

[¶ 53.] This young man, whose grades at the Boot Camp were: Math 96%, English 93%, Social Studies 81%, Science 85%, and School to Work 93%, certainly appears to be worth saving. Is it in the public's interest to place this individual in an adult prison and throw away the key? I think not. While the majority emphasizes the public interest in incarceration, the trial court obviously thought that there was a significant public interest in giving this individual a reasonable chance to become a productive member of society. Considering the encouraging reports of Y.C.'s progress during his attendance at some of the state juvenile correctional programs and the possibilities for further rehabilitation, there is substantial evidence to support the trial court's decision. *State v. Harris,* 494 N.W.2d 619, 627 (S.D.1993) (citations omitted).

[¶ 54.] It is true that some judges would not have resolved the transfer question in the same manner as the trial court did in this case. However, in applying the abuse of discretion standard to this case, "we do not determine whether we would have made a like decision, only whether a judicial mind, considering the law and the facts, could have reached a similar decision." *State v. Wilkins,* 536 N.W.2d 97, 99 (S.D.1995) (citations

omitted). Therefore, based on my review of this record, I conclude that a judicial mind could have decided that a transfer to adult court was not required and such a decision does not amount to an abuse of discretion.