587 N.W.2d 740 (1999)
1999 SD 7
In the Interests of S.K., a Minor Child.
No. 20379.
Supreme Court of South Dakota.
Argued September 16, 1998.
Reassigned November 3, 1998.
Decided January 13, 1999.
Rehearing Denied February 19, 1999.
*741 Mark Barnett, Attorney General, Michele K. Bennett, Assistant Attorney General, Pierre, for appellant State of South Dakota.
Robert L. Chavis, Yankton, for appellee, S.K.
GILBERTSON, Justice (on reassignment).
[¶ 1.] The State of South Dakota appeals an order of the circuit court denying the State's motion to transfer jurisdiction of a then sixteen-year-old minor child, S.K., from juvenile court to adult circuit court. We affirm in part and reverse in part.

FACTS
[¶ 2.] On June 26, 1997, a juvenile petition was filed in Yankton County charging S.K., then sixteen years of age, with first-degree robbery (Class 2 felony), escape (Class 4 felony), and simple assault (Class 1 misdemeanor). The charges arose when S.K. and several other juveniles allegedly escaped from the State Training School in Plankinton, South Dakota. To do so S.K., and the others, physically assaulted an unarmed guard and forcibly took the keys from him. Following the escape, S.K. and the others allegedly stole a truck, driving it until it ran out of gas, stole another truck, got rid of it, and then stole a car. The juveniles eventually drove to Lake Andes where they dropped S.K. off on the Yankton Sioux Reservation. S.K. was subsequently arrested by the tribal police.
[¶ 3.] Following his arrest by the tribal authorities, an extradition hearing was held authorizing extradition to Yankton County. On July 2, 1997, the State filed a motion to transfer, requesting S.K. be transferred to adult court. That day, S.K. was placed at the Minnehaha County Juvenile Detention Center (JDC) pending further order of the court. A transfer hearing was held September 18, 1997. On January 5, 1998, the juvenile court denied the motion to transfer. State now appeals the denial of the motion to transfer, raising the following issues:
1. Whether the State waived the application of SDCL 26-11-3.1.
2. Whether the juvenile court considered the rebuttable presumption that it is in the best interests of the public to transfer jurisdiction to adult court.
3. Whether the juvenile court erred in denying the motion to transfer S.K. from juvenile court to adult court.

STANDARD OF REVIEW
[¶ 4.] The juvenile court has the discretion whether to transfer juvenile proceedings to adult court. SDCL 26-11-4; In re A.D.R., 499 N.W.2d 906, 907 (S.D.1993) (citations omitted). The court's finding will not be reversed absent an abuse of discretion. Abuse of discretion refers to "discretion exercised to an end or purpose not justified by and clearly against, reason and evidence." State v. Jensen, 1998 SD 52, ¶ 20, 579 N.W.2d 613, 617 (quoting State v. Jones 521 N.W.2d 662, 673 (S.D.1994)).

DECISION

[¶ 5.] 1. Whether the State waived application of SDCL 26-11-3.1.
[¶ 6.] The State argues that SDCL 26-11-3.1[1] applies. However, the State failed to *742 proceed under this statute at the juvenile court level, nor requested the court to rule on whether this statute applied in this case. Instead, the State proceeded under SDCL 26-11-10[2] and 26-11-4. It is well settled that "issues not addressed or ruled upon by the trial court will not be addressed by this Court for the first time on appeal." Watertown v. Dakota, Minn. & Eastern R. Co., 1996 SD 82, ¶ 26, 551 N.W.2d 571, 577 (citations omitted).

[¶ 7.] 2. Whether the juvenile court considered the rebuttable presumption that it is in the best interests of the public to transfer jurisdiction to adult court.
[¶ 8.] Under SDCL 26-11-10, a rebuttable presumption exists in favor of the State that it is in the public's best interest to transfer S.K. to adult court. See SDCL 26-11-10 (repealed 1997). The State argues that the juvenile court did not consider this presumption. However, the record reflects that at the transfer hearing the parties argued the presumption to the juvenile court and the juvenile court considered this argument. While there is no specific language mentioning the presumption in the juvenile court's opinion or findings of fact, the court is not required to "enter a finding of fact on every fact presented, but only those findings of fact essential to support its conclusions." Hanks v. Hanks, 334 N.W.2d 856, 858-59 (S.D.1983). This Court "assumes that the trial court took into consideration all of the evidence before making its decision." Id. Upon review of the record in its totality, it is clear the juvenile court considered this rebuttable presumption and concluded it was overcome by the evidence presented.
[¶ 9.] Even if it is assumed the juvenile court failed to apply the presumption, the State offered no objection nor proposed any alternative findings and conclusions to support the position it now advocates. Watertown, 1996 SD 82 at ¶ 26, 551 N.W.2d at 577. "By not objecting to the trial court's findings and conclusions or submitting alternative findings and conclusions, [State] failed to preserve this issue for appeal." Id. "[I]ssues not addressed or ruled upon by the trial court will not be addressed by this court for the first time on appeal." Id. (Citations omitted).

[¶ 10.] 3. Whether the juvenile court erred in denying the motion to transfer S.K. from juvenile court to adult court.
[¶ 11.] "The purpose of juvenile court proceedings is not to punish but rather to rehabilitate and correct a juvenile's behavior so as to avoid future confrontations with the law." Jones, 521 N.W.2d at 667. It is also for the protection of society:
Society must be protected from violent crime and the agony of its effects. It is of little or no comfort to a victim of violent crime and the victim's family that the victim's life was damaged or destroyed by a youth rather than an adult. Protection of society must be sought whether accomplished through rehabilitation or incarceration. Obviously rehabilitation is the preferred route in dealing with juveniles, but it cannot be accomplished in all cases.
People In Interest of Y.C., 1998 SD 76, ¶ 43, 581 N.W.2d 483, 490.
[¶ 12.] We have held when the State files a transfer motion, it should be denied where the juvenile court finds it would be contrary to the best interests of the child and the public to retain jurisdiction over the child. "The motion should be granted where the juvenile court finds that it is contrary to the best interests of the child OR the public *743 to retain jurisdiction over the child." Y.C., 1998 SD 76 at ¶ 7, 581 N.W.2d at 486-87 (citing Jensen, 1998 SD 52, at ¶ 20, 579 N.W.2d at 617). (Emphasis original, italic added). To meet the legislative "best interests" requirement for retention in the juvenile system, there must be a specific program available to establish rehabilitation goals along with sufficient time to complete it so that rehabilitation is likely within the juvenile system. We hold that in this case the juvenile court abused its discretion. This is because retention in the juvenile system is not in the best interests of either this juvenile or the public, let alone one of the two or both.
[¶ 13.] Although the factors contained in SDCL 26-11-4 are not mandatory nor exclusive, they provide a useful analytical framework for factual examination of the transfer question. State v. Harris, 494 N.W.2d 619, 624 (S.D.1993).

[¶ 14.] a. Seriousness of the alleged crime and protection of the community.
[¶ 15.] S.K. is charged with Robbery in the First Degree, SDCL 22-30-6; Escape, SDCL 22-11A-2; and Simple Assault, SDCL 22-18-1(1). Robbery in the first degree is a class two felony that could result in a maximum prison sentence of twenty-five years. See SDCL 22-30-7, 22-6-1. Escape is a class four felony that carries a maximum prison sentence of ten years. See SDCL 22-11A-2, 22-6-1. Simple assault is a class one misdemeanor that carries a maximum penalty of one year in the county jail. See SDCL 22-18-1, 22-6-2.

[¶ 16.] b. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner.
[¶ 17.] S.K. along with six other juveniles escaped from the State Training School where they were confined. S.K., along with the others, physically attacked a guard, beat him and forcibly took his keys to facilitate their escape. S.K. was identified as a leader of the group. The guard sustained bumps on his head, a cut under his right ear and scrapes on the left side of his face. While at large, S.K. was involved in stealing three automobiles. He remained at large and sought to avoid recapture by fleeing to the Yankton Sioux Reservation outside the jurisdiction of the State of South Dakota.

[¶ 18.] c. Whether alleged offense was against persons or property with greater weight given to offenses against persons.
[¶ 19.] Robbery and assault are crimes against persons. Escape is a crime against the State of South Dakota. It should be noted that supervisors of correctional institutions are granted special protection against physical attack by the Legislature. Where the victim is an employee of the Department of Corrections (DOC) and the perpetrator is under its jurisdiction, SDCL 22-18-1.1(6) enhances what would ordinarily be a simple assault into an aggravated assault. Although not charged in this case, the enhancement carries with it a potential sentence of fifteen years.

[¶ 20.] d. Prosecutive merit.
[¶ 21.] The juvenile court entered a finding that there was a "high probability" that S.K. committed the offenses with which he is charged.

[¶ 22.] e. Desirability of trial and disposition of offenses in one proceeding.
[¶ 23.] Two of the compatriots in this incident were prosecuted as adults.

[¶ 24.] f. Record and previous history of S.K.
[¶ 25.] At age eleven, S.K. was caught huffing gasoline and placed on probation. He continued huffing on a weekly basis until he was thirteen. When S.K. was twelve, he burglarized the Santee Public School and was placed on probation. During this period he began using alcohol averaging ten cans of beer a week.
[¶ 26.] In August of 1995 at fourteen, he burglarized the Santee Sioux Tribal Headquarters stealing two guns. He was also using marijuana. In November of 1995 he was sent to the Youth Rehabilitation and Treatment Center in Kearney, Nebraska for burglarizing two bars and involvement in *744 three auto thefts. At that institution he was classified as a high risk requiring maximum supervision. Despite these precautions, he escaped from this facility.
[¶ 27.] When paroled from that institution, he went to the Yankton area where he was charged with armed robbery of a convenience store. He told an investigating officer the only reason he did not kill the clerk was because, "[h]e didn't know where the round was in the cylinder. He only had one bullet."
[¶ 28.] While awaiting disposition on the robbery charge he was sent to McCrossan's Boys Ranch. From there he escaped and was recaptured and placed at Springfield Academy. He also escaped from there. While at large, he stole a car and burglarized a cafe in Avon. He was then sent to the Custer Youth Development Center boot camp in November of 1996. In January of 1997 he was released from the boot camp to a chemical dependency center. He subsequently ran away from this center. He was recaptured and sent to the State Training School in February of 1997. Two months later he escaped and was recaptured the same day. While at the State Training School, he was classified as a high risk. Two months later he allegedly committed the offenses with which he is now charged.
[¶ 29.] In summary, S.K.'s previous history of misdeeds prior to the charges that led to the transfer hearing is much worse than that of Y.C. or Jensen.[3] He has escaped from every institution where he has been placed except for Juvenile Detention Center (JDC) and the boot camp, which are secure facilities. Upon escape or release from every facility including the secure ones, he quickly reverted to his life of crime.

[¶ 30.] g. Prospects for adequate protection of the public and likelihood of reasonable rehabilitation utilizing procedures, services and facilities currently available to the juvenile court.
[¶ 31.] Despite S.K.'s prior history, the juvenile court found he now showed remorse and feared the consequences of being sent to an adult prison. As in Y.C., such eleventh hour statements of remorse and reformation must be carefully examined as to their truthfulness against the juvenile's prior record and actions. In Jensen we noted that when assessing the potential for rehabilitation it is of "significance" that previous extensive attempts have been made to discipline and rehabilitate the juvenile. 1998 SD 52 at ¶ 40, 579 N.W.2d at 619. While S.K. behaved appropriately while being "rehabilitated" at the JDC and the Custer boot camp, both secure facilities, like Y.C., S.K.'s behavior quickly and severely deteriorated after release. "Past conduct is obviously a possible indicator of future conduct." Y.C., 1998 SD 76 at ¶ 42, 581 N.W.2d at 489.
[¶ 32.] The juvenile court was persuaded by the testimony of Jeffrey Lamair (Lamair), a juvenile counselor. Lamair claimed that although S.K. had ultimately failed at every other available DOC juvenile institution, S.K. merely needed a secure environment and that could be provided at the soon to be opened juvenile prison.[4] Lamair felt it could provide "personal guidance, academic and/or vocation training, and specifically close supervision in a very structured setting [which is] necessary to disengage [S.K.] from the gang as well as other street life that he [has] been so accustomed to since the breakup of his family." There was substantial contrary testimony provided by the State that the juvenile court chose not to follow. The juvenile court made a credibility call between the *745 two views on the potential of rehabilitation of S.K. Lamair's views must be examined to determine if they ever can be implemented, let alone ultimately become successful.
[¶ 33.] Although the juvenile court does not say specifically why, it concluded the public would be protected if S.K. were placed in the juvenile prison. Given the court's other findings it appears to make this conclusion by assuming S.K. would be in a secure lock-up until he reached twenty-one unless sooner rehabilitated. Counsel for S.K. also makes this argument.
[¶ 34.] Unfortunately the juvenile court failed to give proper consideration to the time necessary to attempt rehabilitation of S.K. in the juvenile system and where S.K. would be placed in that system. The juvenile court found that DOC could legally retain jurisdiction over S.K. until he reached twenty-one years of age. However, as we noted in Y.C., while SDCL 26-11A-5 and 26-11A-20 so state, "[i]n actuality and practice, DOC does not hold juveniles beyond age 18...." 1998 SD 76 at ¶ 39, 581 N.W.2d at 489. S.K. has now reached the age of eighteen. According to the State, this cuts three years off the period of potential rehabilitation and places him on the street with the public provided no protection whatsoever should he decide to resume his former violent ways. S.K. argues that this is no longer DOC policy. Even so the specifics of the program and its potential for successful rehabilitation are very vague at best.
[¶ 35.] The juvenile court erred in its conclusion, based on Lamair's testimony, that S.K. would automatically be placed at the new juvenile prison rather than some other DOC institution for juveniles, let alone rehabilitated there. "The value of the opinion of an expert witness is no better than the facts upon which it is based. It cannot rise above its foundation and proves nothing if its factual basis is not true." Bridge v. Karl's, Inc., 538 N.W.2d 521, 525 (S.D.1995). The juvenile court even conceded it would have reversed its decision but for its erroneous assumption S.K. could be ordered placed at the new juvenile facility. The court stated, "[w]ere it the fact that the Department of Corrections juvenile prison will be opening in a matter of days, and given [S.K.'s] history of escapes and propensity for violence, transfer to `adult court' would probably be in order." It is not the decision of a juvenile court to determine placement for a juvenile, that is left to the DOC. SDCL 24-2-27, 26-11A-6, 26-8C-7(5).
[¶ 36.] If the deciding factor is, as the juvenile court concluded, it is against S.K.'s interests to have a felony record[5] then no juvenile would ever be transferred to adult court. It is always in a person's best interests not to have a felony record if it can be avoided.
[¶ 37.] It appears the juvenile court further failed to consider the wealth of options available for rehabilitation should S.K. be transferred to adult court. S.K.'s drug and alcohol addictions could be addressed. He could get an education and learn vocational training. If restraint was needed it could be done in varying degrees as necessary. He would not be deposited on the public's doorstep at age eighteen or soon thereafter but could be retained in the system within the limits of his sentence until it was determined he could be safely released. Even at that point if he was paroled, there would be substantial restrictions on him for the public's protection and assistance to help him make it on the outside world. Transferring him hardly equates to locking him up in an adult human warehouse and throwing away the key.
[¶ 38.] The juvenile system does not accomplish its twin goals of rehabilitation of a youth and protection of society by merely warehousing a youth until he is an adult. Clearly the youth is disadvantaged if he is not rehabilitated as he will likely face future lengthy incarceration for future adult criminal acts. His best interests are served by *746 rehabilitation as soon as possible whether it be done in the juvenile system or the adult system.
[¶ 39.] Further we held in Jensen and Y.C. that even if there was an absence of evidence showing it was in the juvenile's best interest to transfer, that is not the only criteria to be considered. The interests of the public also govern and it must be in both the juvenile and public's interests to deny transfer. Y.C., 1998 SD 76 at ¶ 7, 581 N.W.2d at 486-87; Jensen, 1998 SD 52 at ¶ 23, 579 N.W.2d at 617-18. Based on S.K.'s prior conduct while in juvenile institutions, the likelihood of keeping him there absent a lock down is not good. Four years of every type of juvenile institution and their multitude of programs arrive at a result of total failure. Whether he escapes or is legally released in the near future, the public is at serious risk of violent, possibly life-threatening, acts at the hands of S.K. Since S.K. will eventually be released whether treated as a juvenile or an adult, the only real protection society has in the long-term is having S.K. rehabilitated at the time of his release and supervised if necessary for as long as appropriate within the confines of the law after release. Based on the record before us, it can be most likely accomplished in the adult system.
[¶ 40.] For the above reasons, we hold the juvenile court has abused its discretion and reverse on this issue. We do so as there is no substantial evidence in the record to support the juvenile court's findings of fact.
[¶ 41.] MILLER, Chief Justice, and KONENKAMP, Justice, concur.
[¶ 42.] SABERS, Justice, dissents in part and concurs in result in part.
[¶ 43.] AMUNDSON, Justice, dissents.
SABERS, Justice (dissenting in part and concurring in result in part).
[¶ 44.] I agree with Justice Amundson that the trial court did not abuse its discretion in determining that it was in the best interest of the juvenile to be treated as a juvenile and not be transferred to adult court.
[¶ 45.] However, I concur in the result of the majority opinion on the basis that it was in the best interest of the public to transfer this juvenile to adult court.
AMUNDSON, Justice (dissenting).
[¶ 46.] I dissent on Issue 3.
[¶ 47.] Has the trial court abused its discretion based on this record? I would hold it has not.
[¶ 48.] While the majority properly discusses factors delineated in SDCL 26-11-4, it ignores other permissible factors which the trial court did consider in arriving at its decision. In addition to those factors set out by SDCL 26-11-4, the trial court considered:
(1) Age of the juvenile. The juvenile court should consider whether the remaining time of its jurisdiction will be sufficient to complete any rehabilitative program.
(2) Physical and mental maturity. The court should consider the juvenile's home life, school activities, emotional attitude, desire to be treated as an adult, pattern of living, apparent emancipation, and other relevant evidence of the juvenile's maturity.
(3) Necessary treatment. The court should take considerable care to determine what type of treatment or rehabilitative services are best for the juvenile.
(4) Rehabilitative services available. After determining what treatment the juvenile requires, the court should carefully examine the programs available for juveniles and adults to determine where the appropriate treatment can be given.
(5) Previous history. The court should consider previous convictions or adjudication's of delinquency and the nature of the prior offenses, evidence of other antisocial behavior, prior contacts with law enforcement agencies not resulting in court proceedings, and the results of past rehabilitative efforts.
(6) Threat to public safety. The court may consider evidence which would show that confinement and security of the juvenile are necessary for the continuing protection of the public and whether the *747 available juvenile facilities would provide sufficient security.
In re L.V.A., 248 N.W.2d 864, 869 (S.D.1977). The trial court found, upon consideration of these factors, a transfer to adult court would be contrary both to the juvenile's interest and the public's interest. In fact, the trial court found the only factor mitigating against retaining jurisdiction was factor five, previous history. The trial court's findings of fact upon which its order is based "shall not be set aside upon review unless clearly erroneous[.]" SDCL 26-11-4. See also Jensen, 1998 SD 52, ¶ 22, 579 N.W.2d at 617; Harris, 494 N.W.2d at 624. Under this clearly erroneous standard, "we will not disturb the court's findings unless we are firmly and definitely convinced, after a review of the entire evidence, a mistake has been made." Sabhari v. Sapari, 1998 SD 35, ¶ 12, 576 N.W.2d 886, 891 (citing Jasper v. Smith, 540 N.W.2d 399, 401 (S.D.1995)). The trial court found, upon careful consideration of all factors, S.K. properly belonged in juvenile court. My review of the record reveals substantial evidence to support the trial court's decision.
[¶ 49.] While S.K. was sixteen years of age, the court found his emotional maturity was not characteristic of one who desires to be treated as an adult, or has been emancipated. Instead, the evidence showed a frightened young boy who became extremely distraught and depressed over the possibility of going to the state penitentiary. In fact, S.K. was placed under suicide watch while in the JDC awaiting the transfer hearing.
[¶ 50.] Physically, S.K. is of small stature. Mr. Brady, Superintendent of the Training School in Plankinton, testified, based upon his experience in the correctional system, juveniles placed in adult prisons are sometimes raped and otherwise abused by adult criminals. Given his small physical size, the court considered that S.K. may become a target in adult prison.
[¶ 51.] The court considered the necessity of protecting the public from one who has a history of walking away from juvenile detention centers. In addressing this concern, the court considered testimony from the State's witness, Mr. Brady. Brady testified to the availability of a new Department of Corrections juvenile prison which had not been previously available. Brady further testified that such a facility is secure and would be able to contain S.K. so as to abate any apprehension that S.K. would attempt to walk away from the facility. The court considered this testimony and found the public would be equally protected through placement in the juvenile facility as through placement in the state penitentiary.
[¶ 52.] Importantly, the court found there to be credible evidence that S.K. could be rehabilitated and may, in fact, already be on the road towards rehabilitation. It should be remembered, "[t]he purpose of juvenile court proceedings is not to punish but rather to rehabilitate and correct a juvenile's behavior so as to avoid future confrontations with the law." State v. Jones, 521 N.W.2d 662, 667 (S.D.1994). The court specifically found the testimony of Jeffrey Lamair, who had the closest contact with S.K. in the JDC, to be credible. Lamair testified that S.K. had "gone beyond the period of a honeymoon in terms of good behavior" and was capable of making adjustments to correct his troubled past. In contrast, the trial court found the State's witnesses less credible. In fact, the court stated: "State's witnesses are somewhat motivated to `punish' [S.K.] as evidence[d] by [superintendent of the State Training School's] comment that `if [S.K.] is doing adult crimes, he should be doing adult time.'"[6] It is well settled that "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." SDCL 26-11-4. See also Jensen, *748 1998 SD 52, ¶ 22, 579 N.W.2d at 617; Harris, 494 N.W.2d at 624.
[¶ 53.] The court evaluated prior attempts to rehabilitate S.K. State's witness, Joan Tammen, juvenile corrections officer, conceded that previous efforts to rehabilitate were not effective because the State had been unable to detain S.K. in a facility long enough for him to benefit from such programs. S.K.'s record substantiated this observation. The court considered evidence that in a secure, highly structured environment S.K. had a history of doing very well. For example, on a previous adjudication S.K. was placed in boot camp. While there, S.K. did very well and ended up graduating from the program. Similarly, while in the JDC, another highly structured and secure facility, S.K. had done well. While in the JDC, the evidence was that S.K. had been adaptive to the environment, participated in the rehabilitation services available and earned almost full privileges. Testimony was considered that, if S.K. was made part of a "captive audience," there was a reasonable likelihood he could be rehabilitated. Jeffrey Lamair, a counselor with twenty years' of experience at the JDC, testified that "personal guidance, academic and/or vocational training, and specifically close supervision in a very structured setting are what [is] necessary to disengage [S.K.] from the gang as well as other street life that he [has] been so accustomed to since the breakup of his family." Again, the court considered testimony that the new juvenile prison would offer this type of secure, highly structured environment. Considering S.K.'s history of functioning well in highly structured, secure environments, coupled with the fact he would be part of a "captive audience" in the new juvenile prison, the court found S.K. would likely benefit from rehabilitation programs at the new juvenile prison.[7]
[¶ 54.] Furthermore, this new juvenile prison would provide a wealth of rehabilitation services. These services included: behavior counseling, psychological counseling, chemical dependency counseling, educational services, vocational training, work ethic, and religious services. Prior to this new juvenile prison coming on-line, these services had not been available to S.K. The court found S.K. should be allowed the opportunity to benefit from services the new juvenile prison had to offer.
[¶ 55.] On a final note, the court considered Mr. Brady's testimony that in all likelihood S.K. would be placed in the juvenile prison regardless of whether he was tried in adult court or juvenile court.[8] The only difference being, in addition to his drug and alcohol problem, S.K. would now have a felony conviction.[9]
[¶ 56.] Perhaps not all judges would have resolved the transfer question in the same manner as the trial court did in this case. However, in applying the abuse of discretion standard, "we do not determine whether we would have made a like decision, only whether a judicial mind, considering the law and facts, could have reached a similar decision." *749 State v. Wilkins, 536 N.W.2d 97, 99 (S.D.1995) (citations omitted). To hold that the trial court abused its discretion in this case amounts to appellate micromanagement of hard, discretionary decisions made by our trial courts.
NOTES
[1] SDCL 26-11-3.1, which became effective July 1, 1997, provides:

Any delinquent child sixteen years of age or older against whom Class A, Class B, Class 1, or Class 2 felony charges have been filed shall be tried in circuit court as an adult. However, the child may request a transfer hearing which shall be conducted pursuant to SDCL 26-11-4 to determine if it is in the best interest of the public that the child be tried in circuit court as an adult. In such a transfer hearing, there is a rebuttable presumption that it is in the best interest of the public that any child, sixteen years of age or older, who is charged with a Class A, Class B, Class 1, or Class 2 felony, shall be tried as an adult.
[2] SDCL 26-11-10, repealed in 1997, provided:

In any transfer hearing pursuant to § 26-11-4, there is a rebuttable presumption that it is not in the best interest of the public to retain jurisdiction over any child, sixteen years of age or older, who is charged with a Class A, B, 1, or 2 felony.
[3] In fairness to the juvenile court, it did not have the benefit of our decisions in Jensen and Y.C. as it made its decision prior to our issuance of those decisions.
[4] We rejected a similar exhaustion argument in Y.C.

Yet Y.C. appears to argue that a transfer to adult court would be impermissible because there is still at least one juvenile system he has not exhausted, namely the State Training School in Plankinton. In Harris, we rejected a similar claim and refused to mandate that a troubled youth facing transfer must be afforded every possible chance at rehabilitation. "Neither the statute nor our decisions have required the court to find that the juvenile unsuccessfully exhausted the resources of this state's juvenile justice rehabilitation programs prior to transferring proceeding to adult court."
Y.C., 1998 SD 76 at ¶ 40, 581 N.W.2d at 489 (citing Harris, 494 N.W.2d at 625).
[5] This erroneously assumes that a transfer automatically results in a felony conviction. There is always the possibility that a jury may acquit S.K. Even if he pleads guilty or is found guilty of a felony, the trial court has the option of imposing a suspended imposition of sentence. If S.K. is rehabilitated and successfully completes the requirements of the program then it is the same as if the charges are dismissed and he is not a convicted felon. SDCL 23A-27-13 and 23A-27-14.
[6] A [Mr. Brady]: He's committed acts that if tried as an adult would be felonies. And it's my position that it's time for him to wake up to that fact and face those consequences.

Q: Okay. So you think he needsthat he would benefit from having a felony conviction?
A: I don't know if he would benefit, but I think it's time for him to enter the adult system. He's doing adult things.
Q: Okay. Because he's doing adult crimes, he should do adult time?
* * * * * *
A: In this case, I believe so.
[7] State argues placement in juvenile prison would be of no benefit because the minor can walk away at age eighteen. However, the court specifically found in its findings of fact that if the court retains jurisdiction of S.K. the Department of Corrections could legally retain custody of him until age twenty-one, unless sooner rehabilitated and released. SDCL 26-11A-5 and 26-11A-20 provide for the retention of a juvenile until age twenty-one.
[8] Mr. Brady's testimony in relevant part:

Q: So no matter, no matter how [S.K.] gets to the juvenile prison, he's going to get the same services that he would have if he goes through the juvenile system or the adult system is that [true]?
A: That's correct.
[9] Q: And so if the Court should see fit not to transfer [S.K.] to the, the adult court, and he keeps him back in the juvenile system, in all likelihood he'll wind up in the juvenile prison; is that true?

A: That's correct.
Q: Okay. And on the other hand, if he puts him in adult court, where he's tried and convicted and has a felony conviction, there's a possibility he could wind up in the same place?
A: Yes.
Q: Okay. The difference being he would have a felony conviction?
A: That's correct.